[Civ. No. 32536.   Second Dist., Div. Three.   Feb. 26, 1969.]

LUKA BOZANICH, Plaintiff and Appellant, v. JO ANN FISHERIES, INC., Defendant and Respondent.

Magana, Olney, Levy & Cathcart and John A. Marin for Plaintiff and Appellant.

Lillick, McHose, Wheat, Adams & Charles and Francis J. MacLaughlin for Defendant and Respondent.

SCHWEITZER, J.—Plaintiff, a seaman, brought suit against defendant, shipowner, under the Jones Act (46 U.S.C.A. § 688) and general maritime law for damages for injuries alleged to have been sustained while performing duties on defendant's vessel, Jo Ann. Counsel stipulated that the issue of liability would be tried first. The court instructed the jury on the issues of negligence and contributory negligence but refused plaintiff's request to instruct on the issue of unseaworthiness. The jury returned a verdict for the defendant. Plaintiff has appealed from the judgment entered for the defendant, contending that the court erred in refusing to instruct on the issue of unseaworthiness.

### Facts

The Jo Ann was an 86-foot purse seiner, engaged in com-

mercial fishing off Magdalena Bay, Mexico. Her home port was San Pedro, California. She carried a two-ton skiff, 22 feet long, on her afterdeck, resting on the net. Plaintiff and a Mr. Mardesich were assigned as ''skiffmen.'' In the center of the skiff there was a 150-horsepower gasoline engine, covered by a protective housing. Two benches, fore and aft of the housing and attached thereto, ran athwartships. There were also four longitudinal benches, each 8 to 10 inches high and approximately 8 inches wide.

On July 2, 1962, the Jo Ann was cruising at a very slow speed, estimated at two to four knots. The weather was clear, the seas were calm with a slight swell, and there was no wind. The captain was in the crow's nest, serving as a look-out for fish. At 1 p.m. the captain spotted a school of tuna and ordered the skiff into the water. The skiffmen and several deck men lowered the skiff, stern first over the Jo Ann's stern until the stern of the skiff was in the water. The bow of the skiff was placed in special grooves on the Jo Ann's stern and was lashed in position with a $7/8$ inch cable. The stern of the Jo Ann had approximately one foot of freeboard under the bow of the skiff. The plaintiff testified that the skiff was sloping downwards, at a 35 to 40 degree angle. In carrying out his usual duties as a skiffman, plaintiff then got into the skiff, attached the net line to the bow of the skiff and was handed a $3/4$ inch tow cable by the other skiffman from the Jo Ann's afterdeck. There was no testimony as to the length or weight of the cable. It was plaintiff's duty to take this cable around the stern of the skiff and attach it to the towing bit. These were necessary steps to take before the net could be ''set'' and made it possible to free the net and skiff together in one operation. As plaintiff started to move astern, he heard the captain give the order, ''full speed ahead, hard left.'' Moving astern with the cable, and two to five seconds after the captain's order, plaintiff stepped onto the first bench, fell and allegedly sustained injuries. Plaintiff testified that there was sufficient equipment and personnel aboard the Jo Ann and that neither the skiff nor equipment was defective. Plaintiff denied slipping, stating ''I just lost my balance.''

Plaintiff argues that the captain's order was carelessly given and carelessly executed, there being no warning to plaintiff of the command; that the sudden increase in speed of the propeller and the sharp turn caused the skiff to weave and jerk, thus causing plaintiff to lose his balance.

Since plaintiff contends on appeal that the trial court com-

mitted prejudicial error in refusing to instruct the jury on the issue of unseaworthiness, we must make a detailed review of the evidence to determine whether it is sufficient to support an instruction on such issue. The specific instructions requested and refused have not been submitted to us for review. Our opinion is therefore limited to the general question as to whether under the evidence and the law, an instruction on the doctrine of unseaworthiness should have been given, and if so, whether the refusal to give an instruction thereon constituted prejudicial error.

■ It is a well established principle that a party has a right to instructions on his theory of the case, if it is reasonable and finds support in the pleadings and evidence or any inference which may be properly drawn from the evidence.

■ It follows that refusal of proper instructions, if prejudicial, constitutes reversible error. (*Rasich* v. *Gladding McBean & Co.,* 90 Cal.App.2d 241 [202 P.2d 576].)

The plaintiff called as witnesses in his behalf the other skiffman, Louie Mardesich, and John Klarin, who identified himself as the "wheelman." Mr. Klarin testified that in responding to the captain's order, "full speed ahead, hard left," he "pushed the lever full speed and started turning the wheel left." He stated that he had served as a skiffman for approximately one year. When the speed of the engine is increased, there is some delay before the increase in the vessel's speed is noticed, but there is an immediate response by the propeller. It "kicks the skiff around a little bit, especially when you make a hard left," and if the skiffman were standing, it might cause him to lose his balance and fall; "it all depends how big of a shock it is." Before the captain goes into a "set" by releasing the skiff and net, he always asks the crew, "Are you ready?"

Louie Mardesich, the other skiffman, was standing on the afterdeck of the Jo Ann. Just before the accident he handed plaintiff the end of the net and then the cable with the tow line for the net; he then turned around to see if the net was clear, at which time he heard plaintiff yell that he had fallen. He did not see plaintiff fall. The defendant sought to impeach Mr. Mardesich by a written statement given shortly after the accident in which he stated that plaintiff "apparently stepped down from the engine box cover and apparently turned his right ankle. . . . There was no movement on the boat or skiff that would have caused Bozanich to fall." At the trial Mr. Mardesich said that in making these statements to defend-

ant's investigator, he was "guessing." Mr. Mardesich said that it is not customary for the captain to warn the skiffman of changes in speed and course, but that always before going into a "set," the captain asks the crew, "Are you ready?" If the boat had gone into a "set" at the time of the accident, Mr. Mardesich, at his position on the stern, would have been knocked overboard by the net.

Plaintiff testified that he had been a skiffman for seven or eight months. After Mr. Mardesich handed him the towing cable, he started to take it to the stern of the skiff. He then heard the captain order "full speed ahead, hard left." The school of fish were nearby and plaintiff thought the captain was going into a "set," although before going into a "set," the captain always asks, "Are you ready?" Carrying the tow cable to the stern, plaintiff stepped on the first bench and fell. "I didn't slip on the deck. I just lost my balance." Plaintiff said that he could have stepped over the bench but that "it is not easy with cable in hand; the skiff was approximately 35 to 40 degrees." The increased speed of the propeller caused the skiff to "go up and then down," the surge of water "lifted the skiff," and caused it to "wobble."

Captain Resich testified for the defendant. He stated that he did not look astern immediately before or at the time of giving his order, and that he first learned of plaintiff's fall "a couple of minutes" after giving the command. The Jo Ann was powered by a diesel engine. A diesel engine does not respond rapidly to speed changes. If the engine was in gear, it would have taken 10 to 15 seconds before an increase in speed would be noticeable; if not in gear, an additional 10 to 15 seconds. With the skiff in the water, it would take two to three minutes to attain full speed. When moving slowly, the turning radius of a "hard left" turn would be about 400 feet. When near a school of fish and before the net is "set," speed is kept low. In order to follow a school of fish, frequent course changes must be made. During these maneuvers, the skiffman is in the skiff, and it is not the custom or practice to warn him of changes in speed or course. While attached to the stern, the movement of the skiff is from side to side.

An expert defense witness testified that it was not the custom to ask a skiffman if he was ready every time there was to be a course or speed change because the bow of the skiff is lashed to the stern of the mother ship, becoming almost "a solid, permanent part" thereof. The general movement of the

skiff is "sort of a little bit up and down." To avoid noise that will frighten fish, the skiff is launched some distance from the school; as a result you would not expect the net to be "set" immediately after launching the skiff. A diesel engine does not respond rapidly to desired speed changes.

## The Law

### 1. Negligence.

■ With the passage of the Jones Act (46 U.S.C.A. § 688), Congress effectively obliterated all distinctions between the kinds of negligence for which the shipowner is liable, as well as limitations imposed by the fellow-servant doctrine, by extending to seamen the remedies made available under the Federal Employers' Liability Act. The action, like that under the Federal Employers' Liability Act, is based on negligence, and there can be no recovery without proof of lack of due care. Plaintiff, here, sought an award on the basis of negligence, the award was denied him by jury verdict, and plaintiff is not seeking a review thereof.

### 2. The doctrine of unseaworthiness.

Plaintiff contends on this appeal that the trial court erred in not submitting to the jury instructions based on the general maritime requirement that a shipowner must provide a seaworthy ship for his seaman, a type of absolute liability.
■ A complaint based on injuries allegedly sustained as the result of unseaworthiness is addressed to the court sitting in admiralty (*Jesonis* v. *Oliver J. Olson & Co.* (9th Cir. 1956) 238 F.2d 307, 308) and is determined under federal maritime law. (*Intagliata* v. *Shipowners & Merchants etc. Co.*, 26 Cal.2d 365, 369-370 [159 P.2d 1].) We therefore look to federal law for guidance in arriving at our decision. ". . .
■ Although there is no basis in logic for attributing unseaworthiness to a vessel which is in every respect soundly constructed and completely equipped merely because of the negligence of longshoremen[1] or crew members engaged in an operation on board, the term has been created by judicial fiat and used for all practical purposes for imposing absolute lia-

---

[1]The cases hold that a longshoreman is entitled to benefits from the shipowner, the same as the seaman, if the warranty of seaworthiness has been breached. The rationale lies in the presupposition that the longshoreman "is, in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards." (*Seas Shipping Co.* v. *Sieracki*, 328 U.S. 85, 99 [90 L.Ed. 1099, 1109, 66 S.Ct. 872].)

bility on shipowner and stevedore." (*Candiano* v. *Moore-McCormack Lines, Inc.* (2d Cir. 1967) 382 F.2d 961, 962.)

It is unnecessary to dwell at length on the development and expansion of the doctrine of unseaworthiness. A lengthy discussion of its history is set forth in *Mahnich* v. *Southern S.S. Co.,* 321 U.S. 96, 99-104 [88 L.Ed. 561, 564-567, 64 S.Ct. 455], and in *Mitchell* v. *Trawler Racer, Inc.,* 362 U.S. 539, 543-549 [4 L.Ed.2d 941, 944-948, 80 S.Ct. 926]. (See also, concurring opinion of Judge Moore, in denying a rehearing, *Candiano* v. *Moore-McCormack Lines, Inc.* (2d Cir. 1967) 386 F.2d 444.)

█ A brief summary of the basic principles of the doctrine will be helpful. In 1946 the Supreme Court, in *Seas Shipping Co.* v. *Sieracki,* 328 U.S. 85, 94-95 [90 L.Ed. 1099, 1106, 66 S.Ct. 872] defined the obligation of the shipowner to seaman: "It is essentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character. . . . It is a form of absolute duty owing to all within the range of its humanitarian policy. . . ." On page 104 [90 L.Ed. at p. 1111] the court added: ". . . due diligence of the owner does not relieve him from this obligation." In *Mitchell* v. *Trawler Racer, Inc., supra,* 362 U.S., at pp. 549-550 [4 L.Ed.2d at p. 948], the Supreme Court stated: ". . . the owner's duty to furnish a seaworthy ship is absolute and completely independent of his duty under the Jones Act to exercise reasonable care. . . . [t]he shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability. . . . What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence. . . ." Recognizing that seamen are constrained "to accept, without critical examination and without protest, working conditions and appliances as commanded by [their] superior officers . . . [seamen are] not deemed to assume the risk of unseaworth[i-ness]." (*Mahnich* v. *Southern S.S. Co.,* 321 U.S., *supra,* at p. 103 [88 L.Ed. at p. 567, 64 S.Ct. 455].)

Defendant urges on appeal that the doctrine of seaworthiness applies only where a seaman is injured by an unsafe condition which existed *prior* to his injury; that it does not apply where a properly equipped vessel or gear in good condition is negligently misused and *immediately* causes injury to a seaman; that there was no substantial evidence in this case

than an unsafe condition existed prior to the accident; and that under the facts, plaintiff's sole remedy was in seeking recovery in negligence under the Jones Act. Defendant cites as authority: *Imperial Oil, Limited* v. *Drlik* (6th Cir. 1956) 234 F.2d 4, 8; *Morrell* v. *United States* (9th Cir. 1961) 297 F.2d 662; *Radovich* v. *Cunard S.S. Co.* (2d Cir. 1966) 364 F.2d 149; *Penedo Cia Naviera S.A.* v. *Maniatis* (4th Cir. 1959) 262 F.2d 284, 287; *Antoine* v. *Lake Charles Stevedores, Inc.* (5th Cir. 1967) 376 F.2d 443; *Titus* v. *The Santorini* (9th Cir. 1958) 258 F.2d 352, 355; and *Beeler* v. *Alaska Aggregate Corp.* (9th Cir. 1964) 336 F.2d 108.

These cases present somewhat similar factual situations with identical conclusions of law drawn therefrom. Typical is *Beeler, supra,* in which plaintiff was injured due to the mishandling of a ship's ladder by a coworker. In reversing a judgment for plaintiff the court said at page 109: ''Liability on the ground of unseaworthiness does not attach if the injury was sustained by the negligent use of a seaworthy appliance at the very moment of injury. It does attach if the negligent act has terminated and an appliance has been left in an unsafe condition.''

We are aware, however, that there are many cases with similar facts in which the courts have rejected operational negligence and the time element as factors in the determination of liability for unseaworthiness, among them being the following, decided after those cited and relied on by defendant: *Waldron* v. *Moore-McCormack Lines, Inc.* (1967) 386 U.S. 724 [18 L.Ed.2d 482, 87 S.Ct. 1410]; *Mascuilli* v. *United States* (1967) 387 U.S. 237 [18 L.Ed.2d 743, 87 S.Ct. 1705]; *Candiano* v. *Moore-McCormack Lines, Inc.* (2d Cir. 1967) 382 F.2d 961 (rehearing denied, 386 F.2d 444); *Alexander* v. *Bethlehem Steel Corp.* (2d Cir. 1967) 382 F.2d 963; *Venable* v. *A/S Det Forenede Dampskibsselskab* (4th Cir. 1968) 399 F.2d 347 (reversing the district court opinion ((E.D. Va. 1967) 275 F.Supp. 591), cited and relied on by defendant).

Judge Moore, in his concurring opnion denying a rehearing in *Candiano, supra,* (2d Cir. 1967) 386 F.2d 444, makes a lengthy analysis of the conflicting decisions, stating that in the Second Circuit the panels have been hopelessly divided, and the other circuits have achieved no greater consistency. He points out that even after *Mascuilli, Candiano* and *Alexander, supra,* ''confusion still reigns'' (at page 446), that the Supreme Court and the circuit courts continue to reach incon-

sistent conclusions. He notes as examples that one week before *Mascuilli, supra,* the Supreme Court denied certiorari in *Foster* v. *Lykes Bros.,* 387 U.S. 908 [18 L.Ed.2d 627, 87 S.Ct. 1685], in a case where the Fifth Circuit denied recovery to a longshoreman who claimed a vessel was rendered unseaworthy by reason of the contemporaneous negligence of a co-worker, the Fifth Circuit holding that the doctrine of unseaworthiness did not apply. Two weeks after *Mascuilli, supra,* the Supreme Court denied certiorari in *Fenton* v. *A/S Glittre,* 387 U.S. 944 [18 L.Ed.2d 1331, 87 S.Ct. 2077] in which the Second Circuit affirmed the dismissal of a complaint on the basis that there is no such thing as instantaneous unseaworthiness.

Although we still find some conflicting decisions, the number is diminishing. There appears to be a trend toward uniformity, evidenced by cases reported since the date of entry of judgment by the trial court herein.

*Mascuilli* v. *United States, supra,* 387 U.S. 237 [18 L.Ed.2d 743, 87 S.Ct. 1705] has become a landmark case. The Supreme Court disposed of it without opinion, granting certiorari, reversing the judgment and citing: *Mahnich* v. *Southern S.S. Co.,* 321 U.S. 96 [88 L.Ed. 561, 64 S.Ct. 455] and *Crumady* v. *"Joachim Hendrik Fisser,"* 358 U.S. 423 [3 L.Ed.2d 413, 79 S.Ct. 445]. The Second Circuit in *Candiano* v. *Moore-McCormack Lines, Inc., supra,* 382 F.2d at p. 962, set forth in the following summary of *Mascuilli*: ''In *Mascuilli,* the question before the Supreme Court on certiorari, to which the Court gave an affirmative answer, was:

'Does dangerous condition caused by stevedore's negligent handling of proper equipment render vessel unseaworthy and its owner liable for resulting injuries?' 35 L.W. 3052.

''The facts are to be found in the district court opinion, [*Mascuilli* v. *United States*] (E.D. Pa. 1965) 241 F.Supp. 354. A longshoreman Mascuilli had been killed during a loading operation when one or more of his fellow longshoremen negligently caused both the starboard and port vangs on the loading boom to become taut simultaneously thus causing one of the vangs to break. The parts thereof fell on Mascuilli, who had been engaged in a different aspect of the loading operation, and inflicted mortal wounds. The district court sitting without a jury expressly found that the loading equipment was in a sound and safe condition. Finding of fact #35 read as follows:

'35. In summary, the Court finds that the vessel and all of its equipment was in a seaworthy condition at all times, and

remained so throughout the entire loading operations. The accident was caused solely by the negligent operation of the stevedoring crew using seaworthy equipment in such a manner as to cause the accident to occur *so instantaneously* that the Third Officer was unable to warn anyone or prevent its happening.' 241 F.Supp. at 362 (emphasis added).

''The Third Circuit affirmed the holding that the vessel was not unseaworthy solely on the basis of the district court's finding #35 that the accident had been caused solely by the negligence of the stevedoring crew. [*Mascuilli* v. *United States*] 358 F.2d at 133. The Supreme Court thereupon summarily reversed. . . .''

In *Candiano* v. *Moore-McCormack Lines, Inc., supra* (2d Cir. 1967) 382 F.2d 961, a longshoreman was injured during loading operations by a beam which fell when a hook became dislodged. In affirming the trial court's decision of unseaworthiness, the Second Circuit, citing *Mascuilli, supra,* stated on pages 961-962: ''Whether . . . 'an appreciable period of time' is sufficient to defeat the application of the doctrine of operational negligence . . . is apparently no longer the relevant inquiry to be made as the doctrine of operational negligence now seems to have been rejected by the Supreme Court as a factor in the determination of liability. . . .'' (See also *Alexander* v. *Bethlehem Steel Corp, supra* (2d Cir. 1967) 382 F.2d 963, in accord.)

In *Venable* v. *A/S Det Forenede Dampskibsselskab, supra* (4th Cir. 1968) 399 F.2d 347, a longshoreman was injured while stowing hogsheads of tobacco in a ship's hold when he stepped backwards and fell into empty spaces between hogsheads. The Fourth Circuit was presented with the question, ''To what extent can the 'operational negligence' alone of a longshoreman or his fellow workers give rise to an action for 'unseaworthiness'?'' In reversing the trial court on the ground that its instruction had given undue emphasis to the time factor, the court noted on page 350 that many cases over-emphasized the temporal aspect holding ''that a shipowner was liable [under the doctrine of unseaworthiness] only if he or his agents were negligent in failing to detect and rectify the condition. . . . However, this requirement of a lapse of time after the significant act in order to create liability was explicitly rejected by the Supreme Court in *Mitchell* v. *Trawler Racer, Inc.,* 362 U.S. 539, 549-550 [80 S.Ct. 926, 933, 4 L.Ed.2d 941, 947-948] (1960). In the course of its opinion the

court stated: '[T]he shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability. . . .' " On page 351 the Court added: "The [Supreme] Court's brief pronouncement in *Mascuilli* has been considered and interpreted in two cases in the Second Circuit [*Candiano* and *Alexander*, both *supra*]. We find ourselves in accord with that circuit's conclusion that *Mascuilli* must be read as rejecting operational negligence 'as a factor in the determination of liability' . . . [citing *Candiano* and *Alexander*, both *supra*]. It is now settled that the negligent misuse of safe and sufficient equipment renders a vessel unseaworthy. See *Waldron* v. *Moore-McCormack Lines, Inc.* [*supra*] 386 U.S. 724, 727 [87 S.Ct. 1410, 18 L.Ed.2d 482, 485] (1967)."

In *Waldron, supra,* in connection with a ship's docking operations, plaintiff and another seaman were ordered to uncoil and carry a heavy rope. While uncoiling the rope, plaintiff fell and suffered injuries. In a suit against the shipowner negligence and unseaworthiness were alleged. Expert evidence was presented to the effect that three or four men, rather than two, were required to handle the rope in order to constitute safe and prudent seamanship. The jury found for the defendant on the negligence issue. The trial court directed a verdict for the defendant on the issue of unseaworthiness and the appeal was based on this action. In reversing the trial court the Supreme Court stated: ". . . [U]nder *Crumady* [358 U.S. 423, 3 L.Ed.2d 413, 79 S.Ct. 445] it makes no difference that the third mate and the two men he assigned to perform the job were themselves competent seamen, or that the rope was itself a sound piece of gear. By assigning too few men to uncoil and carry the heavy rope, the mate caused both the men and the rope to be misused.

"This analysis, we believe, is required by a clear recognition of the needs of the seaman for protection from dangerous conditions beyond his control and the role of the unseaworthiness doctrine which, by shifting the risk to the shipowner, provides that protection. If petitioner had been ordered to use a defective pulley in lifting the rope, he would clearly be protected by the doctrine of unseaworthiness. If the pulley itself were sound but petitioner had been ordered to load too much rope on it, he would likewise be protected. If four men had been assigned to uncoil the rope but two of the men lacked the strength of ordinary efficient seamen, petitioner would again be protected. Should this protection be denied merely because the shipowner, instead of supplying petitioner

with unsafe gear, insufficient gear, or incompetent manual assistance, assigned him insufficient manual assistance? We think not. . . .

"Petitioner is entitled to present his theory of unseaworthiness to the jury, and the case is reversed and remanded for that purpose." (386 U.S. at pp. 727-729 [18 L.Ed.2d at p. 486].)

Any argument by a shipowner that an activity was being performed in accordance with the usual custom and practice of the industry is no defense to a charge of unseaworthiness. ". . . '[W]e fail to perceive any logical reason why trade customs should be permitted to form the legal standard of seaworthiness in actions under maritime law.' [citation] The duty of the shipowner is to assure a reasonably safe ship for all who work on board. This obligation is not satisfied by a showing that he has exercised reasonable care or due diligence, see *Sieracki*, . . . 328 U.S. at 104 [90 L.Ed. at p. 1111, 66 S.Ct. 872] . . . ; *Mahnich*, . . . 321 U.S. at 100 [88 L.Ed. at p. 565, 64 S.Ct. 455], . . . or that he has complied with industry practice which may be guided by economy in disregard of the men's safety. . . . We must never permit the safety of the men to be subordinated to the perpetuation of industry practices, if these fall short of the law's strict requirements." (*Venable* v. *A/S Det Forenede Dampskibsselskab* (4th Cir. 1968) 399 F.2d 347, 353.)

It is our opinion that the principles of the foregoing cases are decisive of the facts in the instant case and that we are bound thereby. It is not for us to comment on the recent extensions of the doctrine of unseaworthiness by the Supreme Court, which by judicial fiat have in effect given seamen similar benefits and rights as those provided by workmen's compensation laws. Dissenting members of that court have been outspoken in their criticism, urging that such steps are for legislative consideration, not for the judiciary. As Justice Harlan said in his dissenting opinion in *Mitchell* v. *Trawler Racer, Inc., supra,* 362 U.S. at p. 573 [4 L.Ed.2d at pp. 961, 962] : " [I]t is not for a court, even a court of admiralty, to fashion a tort rule solely in response to considerations which underlie workman's compensation legislation, weighty as such considerations doubtless are as a legislative matter. Citation is not needed to remind one of the readiness of Congress to deal with felt deficiencies in judicial protection of the interests of

those who go to sea. We should heed the limitations on our own capacity and authority.''

From the foregoing decisions we draw the following conclusions relative to the doctrine of unseaworthiness: even if a vessel or the equipment furnished for a particular task is in good condition, safe and sufficient, its misuse by the crew renders the ship unseaworthy; even if a vessel is fully manned with a competent crew, the improper assignment of the crew will render the ship unseaworthy; the law no longer requires that there must be a pre-existing unsafe condition, that recovery may be had if the unsafe condition is created and the accident occurs simultaneously; a vessel may be unseaworthy even though there may be no negligence on the part of the owner or his agents; due diligence of the shipowner does not relieve him of his obligation; actual or constructive knowledge of an unsafe condition by the shipowner or his agents is not a prerequisite for liability; liability for a temporary unseaworthy condition is the same as the liability that would attach if the condition were permanent; neither assumption of risk nor negligence on the part of an injured seaman absolves a shipowner from liability; liability is completely independent of the shipowner's duty under the Jones Act to use reasonable care; compliance with accepted industry customs and practices is not a defense to a charge of unseaworthiness. ''What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or every imaginable peril of the sea, but a vessel reasonably suitable for her intended service. . . .'' (*Mitchell* v. *Trawler Racer, Inc., supra,* 362 U.S. at p. 550 [4 L.Ed.2d at p. 948].)

### The Evidence

We now look at the evidence in the light most favorable to the plaintiff to see whether it was sufficient, under the foregoing principles and standard of care, to require submission of the issue of unseaworthiness to the jury.

It was admitted that there were sufficient personnel and equipment aboard the Jo Ann, and that neither the skiff nor the equipment was defective. It was also admitted that the procedures being followed were those normally used by the industry in ''setting'' a net. The captain was aware of the

location and angle of the skiff, and that plaintiff had to attach the net line to its bow and a three-quarter inch tow cable to a towing bit in its stern. Without looking aft and without warning, the captain ordered ''full speed ahead, hard left,'' preparatory to ''setting'' the net. The captain knew that changes in speed and course would have some effect on the movement of the skiff.

Plaintiff and his witnesses described the effect of the order on the skiff. Mr. Klarin said that although there might be some delay in increase of the ship's speed, the response of the propeller may be immediate. It ''kicks the skiff around a little bit, especially when you make a hard left,'' and if the skiff-man were standing, it might cause him to lose his balance and fall; ''it all depends how big of a shock it is.'' Plaintiff testified that he could have stepped over the bench but that ''it is not easy with cable in hand; the skiff was approximately 35 to 40 degrees.'' The increased speed of the propeller caused the skiff to ''go up and then down.'' The surge of water ''lifted the skiff'' and caused it to ''wobble.'' ''I didn't slip on the deck. I just lost my balance.''

It is our opinion that under the foregoing facts and under appropriate instructions the jury might reasonably have concluded that the order of the captain and the response of the man at the wheel rendered the vessel unseaworthy. ■ If inadequate or unqualified personnel, or if defective or improperly used equipment be held to be sufficient for a finding of unseaworthiness, it necessarily follows that sudden operational changes of a vessel, without warning, may likewise support a finding of unseaworthiness. There can be no doubt that a negligent or improvident act of a competent officer can result in unseaworthiness if it renders otherwise seaworthy equipment unfit for its intended use.

■ We are aware that the jury has already found against plaintiff on the issue of negligence. Defendant contends that the jury could not have found in plaintiff's favor on the issue of seaworthiness in view of its verdict on negligence. There is support for defendant's contention in the dissenting opinion of Justice White in *Waldron, supra,* 386 U.S. at pp. 729-730 [18 L.Ed.2d at p. 487]. The majority opinion, however, rejects this contention. But as was pointed out in *Mitchell, supra,* 362 U.S. at p. 550 [4 L.Ed.2d at p. 948], on the issue of negligence the standard is the use of due care; on the issue of unseaworthiness, the standard is reasonable fitness. Furthermore such defenses as assumption of risk and

contributory negligence, available on the negligence issue, are not available on the unseaworthiness issue.

· Plaintiff is entitled to present his theory of unseaworthiness to the jury. The judgment is reversed with directions for trial on the issue of unseaworthiness only.

Ford, P. J., and Moss, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 23, 1969.