[Civ. No. 41113. Second Dist., Div. Five. July 22, 1974.]

MARJORIE B. GREEN et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES et al.,
Defendants, Cross-complainants and Appellants;
LOUIS DREYFUS & COMPANY, LTD.,
Defendant, Cross-complainant and Appellant;
LINK-BELT DIVISION OF FMC CORPORATION,
Defendant, Cross-defendant and Appellant.

## COUNSEL

Burt Pines, City Attorney, Walter C. Foster, Deputy City Attorney, Murchison, Cumming, Baker & Velpmen, Robert M. Schreiber, Ellis J. Horvitz, Gerald H. B. Kane, Shield & Smith and Peter Berwick for Defendants, Cross-complainants and Appellants.

Cooper, White & Cooper, R. Barry Churton and Neil L. Shapiro for Defendant, Cross-complainant and Appellant.

Virgil R. Wells and A. P. G. Steffes for Defendant, Cross-defendant and Appellant.

Magana, Cathcart, Marin & Pierry, John A. Marin and Charles D. Sneathern for Plaintiffs and Respondents.

## OPINION

**LORING, J.**[*]—Marjorie B. Green and Gregory Jerome Green, a minor, by his guardian ad litem, Marjorie B. Green (hereafter, collectively Green) filed an action for damages for the wrongful death of Aldine R. Green (their husband and father, respectively). Jack R. Harris, Sr. (Harris) joined in the action as plaintiff to recover damages for personal injuries. Both claims arose out of an accident that occurred on March 30, 1968, at berth 174 Los Angeles Harbor in which Aldine R. Green was killed and Harris sustained personal injuries. Named as defendants,[1] were City of Los Angeles, Los Angeles Harbor Department (hereafter, collectively City), Los Angeles Harbor Grain Terminal, a corporation, Mortimer Rycraft & Wallace, Inc., a corporation, Mortimer & Wallace, Inc., a corporation, Richard B. Mortimer and Howard L. Wallace[2] ("Grain Termi-

---

[*]Assigned by the Chairman of the Judicial Council.

[1]We refer to the defendants by the correct names under which they entered appearances irrespective of how they were named in the first amended complaint and irrespective of whether they were served under fictitious names.

[2]The court rendered judgment in favor of Mortimer, Rycraft & Wallace, Inc., a corporation, Mortimer & Wallace, Inc., a corporation, Richard B. Mortimer and Howard L. Wallace, as both defendants and cross-defendants. The court found in favor of Harbor Grain Terminal, a corporation, as a defendant, but against it as a cross-defendant. Hereafter, the term "Grain Terminal" will refer to Harbor Grain

nal"), Louis Dreyfus & Co., Ltd., a corporation (Dreyfus), Link-Belt Division of FMC Corporation, a corporation (Link-Belt). Metropolitan Stevedore Company (Metropolitan) asserted a lien for reimbursement of workmen's compensation expenditures. Most of the defendants filed cross-complaints against other defendants for indemnity which will be hereinafter referred to in detail only to the extent necessary to a consideration of the issues. After nonjury trial the court filed detailed findings of fact and conclusions of law and awarded judgment in favor of Green in the gross sum of $232,713.93 and in favor of Harris in the sum of $18,500; Metropolitan was allowed a lien for $12,704 against Green, and $2,274.35 against Harris. Dreyfus and Link-Belt were found to be jointly and severally liable to Green and Harris. However, Dreyfus was allowed a judgment for indemnity against City, Grain Terminal and Link-Belt for whatever portion of the judgment it paid. City and Grain Terminal were allowed a judgment of indemnity against Link-Belt for whatever portion of the judgment they paid.

Associated Banning Stevedore (predecessor of Metropolitan) and Metropolitan were absolved of all liability for the accident.

Under the judgment of the court, although the initial award in favor of plaintiffs was against Dreyfus and Link-Belt, since Dreyfus and certain defendants were given rights of indemnity, the ultimate total liability was imposed upon Link-Belt. Link-Belt, City, Grain Terminal and Dreyfus all appeal from the judgment.

## FACTS

The parties are in substantial agreement regarding the circumstances under which the accident occurred. It is essential at the outset, however, to understand the occupations or capacities of the various defendants: City was the owner—lessor of berth 174 at Los Angeles Harbor; Dreyfus was the owner operator of a vessel *M. V. La Marea* which was afloat in navigable waters docked alongside of berth 174, in the process of being loaded with alfalfa pellets in bulk form. Grain Terminal leased from City a bulk loading facility (hereinafter described in more detail) at berth 174. Metropolitan acted as Stevedore for Grain Terminal in loading and unloading vessels at berth 174. Link-Belt sold a secondhand rebuilt crane to City which Metropolitan used in the operation of loading the alfalfa pellets which were supplied by Grain Terminal into the holds of *M. V.*

Terminal, a corporation, unless otherwise noted. Mortimer, Rycraft & Wallace, Inc., Mortimer & Wallace, Inc., Richard B. Mortimer and Howard L. Wallace were merely predecessors in interest or otherwise interested in Grain Terminal.

*La Marea.* Aldine R. Green and Harris were employed by Metropolitan in the loading operation.

Grain Terminal maintained its supply of alfalfa pellets at a storage point some distance from berth 174. The pellets were transferred from the point of storage to the vessel by a conveyor belt which went over the roof of the transit shed at berth 174. The section of the conveyor belt which ran from the roof of the shed to the vessel, known as the "K Belt" was held in place by the boom of the gantry crane (sold by Link-Belt to City) which ran on tracks affixed to the dock. The end of K Belt next to the vessel was placed in the particular open hatch of the hold of the vessel which was being loaded. When a hold was loaded it was necessary to add a "trimmer" to the end of the K Belt in order to allow the bulk commodity being loaded to flow into the furtherest area of the particular hold. When the hold was partially filled, the trimmer was removed and the bulk commodity was allowed to "free flow" until the hold was full. Normally, as the various holds of the vessel were filled, the crane, moving along the tracks would swing the K Belt to the next open hatch of the next hold of the vessel to be filled. The crane could also raise and lower the K Belt to adjust to changing tides. This capability and flexibility allowed the vessel normally to remain stationary at one point of the berth during loading operations. However, sometime prior to March 30, 1968, a fire had occurred on the dock where berth 174 was located so that the crane was not able to move along the dock in its customary manner for a distance of more than 15 feet. On March 30, 1968, therefore, it was necessary to move the vessel along the dock in order to completely load all of the holds. The vessel was moved fore or aft along the dock as required, from time to time, by a process of moving a spring line from one bollard on the dock to another and the other end of the spring line was taken in on the ship's winch by the ship's crew so that in result the vessel was able to "haul" itself fore or aft as required. On March 30, 1968, Aldine R. Green and Harris were engaged in the process of operating the K Belt at the open hatch on the vessel while the bulk alfalfa was in transit into the hold and they affixed and removed the trimmer as required. These services were performed on the deck of the vessel. In addition when a hold was filled to capacity and the conveyor belt was stopped preparatory to moving the K Belt to the next open hatch Green and Harris would leave the deck of the vessel, affix the appropriate spring line to the appropriate bollard so the ship could be "hauled" fore or aft as required in order to load the next hold. These services were performed under the direction of the ship's officers and crew. After the spring line was properly affixed the vessel's crew would operate the vessel's winches to move the ship

the required distance. These same services were performed by Green and Harris on the previous day. Prior to moving the vessel the gantry crane would raise the K Belt away from the open hatch of the hold which had just been loaded. After the vessel was moved the gantry crane would then lower the K Belt into the opening of the hatch of the empty hold which was to be loaded next in order. On March 30, 1968, just after hold number 3 had been filled and the workmen were preparing to load hold number 2, Green and Harris left the deck of the vessel and went to the dock. They affixed the crane's hook to the sling used to raise and lower the K Belt and were in the process of placing a forward moving line from one bollard on the wharf to an aft bollard so that the vessel could be "hauled" along the wharf to a point where hold number 2 could be filled. The crane operator began lifting the K Belt from the dock, swinging it toward the open hatch of hold number 2 on the vessel. When the boom of the crane and the K Belt were directly over Green and Harris "the shaft" on the crane fractured causing the crane boom and K Belt to fall on the dock striking Harris and falling on Green who were at that instant placing the mooring line on the bollard. The K Belt weighed several thousand pounds. Green was killed; Harris sustained personal injuries. The court found that the crane operators were not negligent and the sole cause of the accident was a defective condition of the crane hereinafter discussed in more detail.

## CONTENTIONS

The contentions of the various parties may be briefly summarized as follows:

I *Appellant Dreyfus contends*:

A. The trial court erred in holding federal maritime law applied to the accident and in holding that the warranty of seaworthiness was owed by Dreyfus to Green and Harris.

B. The trial court erred in holding that the *La Marea* was unseaworthy as to Green and Harris.

II *Appellant Link-Belt contends*:

A. The trial court erred in failing to make certain findings as requested.

B. The Court of Appeal may independently interpret the "One Year Guarantee" clause of the contract under which Link-Belt sold the crane to the City.

C. The City was an active tortfeasor primarily liable to plaintiffs.

D. Findings of facts are fatally defective in establishing liability of Link-Belt.

E. As lessor of the crane the City was strictly liable.

F. The trial court committed error in applying maritime law.

G. City was an "employer" under Labor Code section 6304 obligated to provide a safe place to work under Labor Code sections 6400 and 6401.

H. The alleged negligence, if any, of Link-Belt was not a proximate cause of the accident but was superseded by negligence of others.

I. City's duties were nondelegable.

J. Repairs to the crane in 1961 prevented application of doctrine of strict liability.

K. City and other defendants had active knowledge of alleged defective condition of the crane.

L. Trial court committed error in concluding Link-Belt was obligated to indemnify other defendants and in refusing requested findings.

III *City as respondent contends*:

A. It is entitled to indemnity from Link-Belt.

B. The findings were sufficient.

*City as appellant contends*:

A. Trial court committed error in holding Dreyfus liable under maritime law, and therefore City should not have been held liable to Dreyfus.

B. City did not act as stevedore or wharfinger in supplying crane to Grain Terminal, therefore, maritime law under which City was held liable to Dreyfus was inapplicable.

IV *Grain Terminal as respondent contends*:

A. Its judgment against Link-Belt should be sustained.

B. Judgment in favor of Grain Terminal and against plaintiffs should be sustained.

*Grain Terminal as appellant contends*:

A. Trial court committed error in concluding maritime law applied and in allowing judgment in favor of Dreyfus against Grain Terminal.

B. Grain Terminal was not a stevedore, therefore, there was no warranty of workmanlike performance owed to Dreyfus.

## DISCUSSION

### A. *Cause of Accident*

The court found: that the crane had been built originally in 1931, but was sold by Link-Belt to City in 1959; as originally built the crane had a capacity of 5 tons at a 51-foot radius; that Link-Belt made various and sundry changes in the crane and attempted to increase its capacity to 14,000 pounds by adding 3,000 pounds to the counterweight of the boom; that Link-Belt did not test, inspect, or otherwise ascertain the effect of the increase in capacity on the crane's mechanical parts, drives, or other components; that during 1961[3] the left front of the gear reduction housing fractured; that this was a part of the luffing cable drum assembly and drive components; that the fracture was repaired. Link-Belt had knowledge of the fracture and repairs, but conducted no tests, although it was standard practice in the industry to do so; that prior to the sale of the crane by Link-Belt to City, Link-Belt conducted no tests of the luffing cable drum drive "shaft" which later failed; at the time of sale Link-Belt supplied a manual to City which contained no warnings; that at time of sale of the crane to City, Link-Belt knew the use which City would make of the crane; that City was relying on Link-Belt to supply and furnish a suitable crane and Link-Belt impliedly warranted that the crane was suitable for the intended purpose and expressly warranted to City and foreseeable users that the condition of the crane and parts were as if the crane were new. The court further found: that the cause of the accident was a fracture of the "shaft" in the crane and that the proximate cause of the failure of the shaft was a "fatigue crack which started several years prior to March 30, 1968" and "slowly progress[ed] to the point where the shaft failed;" that immediately prior to the failure the effective cross-sectional area of the shaft was approximately four-ninths of its original load bearing cross-sectional area so that at the time of failure its effective load bearing capacity was less than required to lift and hold the K Belt assembly; that Link-Belt knew when it sold the

---

[3]This was prior to acceptance by City. It had a period of time after the purchase within which to indicate its acceptance.

crane that it would be used without inspection for defects; that only a small portion of the shaft not exceeding two inches was visible to users; that the crane was defective in design and manufacture at the time of sale to the City; Link-Belt should have disassembled the crane and inspected it prior to sale; that the failure of the shaft was not due to improper usage; that the shaft was defectively designed and machined so that sharp-cornered radii existed between its different diameters which set up fatigue stress concentration points; that the shaft failed at a point where a reduction of the diameter was machined; that the use of sharp-cornered radii was a design defect; that the fatigue cracking proximately resulted from the design defect and the failure of the shaft was the direct and proximate result of the fatigue cracking; that Harris and Green were not aware of the defect and had no opportunity to guard against it; that none of the defendants other than Link-Belt knew or should have known of the defect; that Harris and Green were innocent bystanders whose injury was reasonably foreseeable by Link-Belt; that the crane was being used in the way and for the purpose intended; that the crane was dangerous and unsafe for the intended use; that the crane was not fit for the purpose reasonably intended; that the defective condition of the crane was a proximate cause of the death of Green and the personal injuries of Harris.

### B. *Liability of Dreyfus*

The liability of Dreyfus was predicated on two theories: (a) that the crane was essential to the loading operation of the *La Marea* and was used in the place of the *La Marea* gear in her service and since the crane was an appurtenance of the *La Marea* that there was a breach of warranty of seaworthiness of the crane by Dreyfus; (b) that Green and Harris, although normally stevedores, or longshoremen, at the time of the accident were engaged in the performance of duties and services as seamen under the direction of the vessel's officers and crew and Dreyfus, therefore, owed them the same duty of seaworthiness and care which it owed its own crew.

Dreyfus argues that the recent decision of the United States Supreme Court in *Victory Carriers, Inc.* v. *Law,* 404 U.S. 202 [30 L.Ed.2d 383, 92 S.Ct. 418] decided December 13, 1971 [the judgment in the case at bar was filed August 2, 1971, 133 days before] is otherwise and is controlling. *Victory Carriers, Inc.,* established that "the claim that a ship or its gear was unseaworthy would be rooted in federal maritime law, not the law of the [s]tate . . . ." (P. 204 [30 L.Ed.2d p. 386].) The court held that "federal maritime law does not govern this accident." (P. 204 [30 L.Ed.2d p. 386].) The accident referred to was an accident where part of a forklift

fell on a stevedore while he was driving the forklift on a pier while he was engaged in loading a ship. The court said: "Nor, in the absence of congressional guidance, are we now inclined to depart from prior law and extend the reach of the federal law to pier-side accidents caused by a stevedore's pier-based equipment." (P. 204 [30 L.Ed.2d pp. 386-387].) The court also said: "The historic view of this Court has been that the maritime tort jurisdiction of the federal courts is determined by the locality of the accident and that maritime law governs only those torts occurring on the navigable waters of the United States. Maritime contracts are differently viewed, but as Mr. Justice Story remarked long ago: 'In regard to torts I have always understood, that the jurisdiction of the admiralty is exclusively dependent upon the locality of the act. The admiralty has not, and never (I believe) deliberately claimed to have any jurisdiction over torts, except such as are maritime torts, that is, such as are committed on the high seas, or on waters within the ebb and flow of the tide.' *Thomas* v. *Lane,* 23 F.Cas. 957, 960 (No. 13,902) (CC Me. 1813).

"The view has been constantly reiterated." (404 U.S. p. 205 [30 L.Ed.2d p. 387].)

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The maritime law was thought to reach '[e]very species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters . . . .' *Atlantic Transport Co.* v. *Imbrovek,* 234 U.S. 52, 60 (1914). But, accidents on land were not within the maritime jurisdiction as historically construed by this Court. Piers and docks were consistently deemed extensions of land; injuries inflicted to or on them were held not compensable under the maritime law. *The Plymouth,* 3 Wall. 20, 36 (1866); *Ex parte Phenix Insurance Co.,* 118 U.S. 610, 618-619 (1886); *Johnson* v. *Chicago & Pacific Elevator Co.,* 119 U.S. 388, 397 (1886); *Cleveland Terminal & Valley R. Co.* v. *Cleveland S. S. Co.,* 208 U.S. 316, 320 (1908). The gangplank has served as a rough dividing line between the state and maritime regimes." (404 U.S. pp. 206-207 [30 L.Ed.2d p. 388].)

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"That longshoremen injured on the pier in the course of loading or unloading a vessel are legally distinguished from longshoremen performing similar services on the ship is neither a recent development nor particularly paradoxical. The maritime law is honeycombed with differing treatment for seamen and longshoremen, on and off the ship, and affirmance of the Court of Appeals would not equalize the remedies that both this Court

and Congress have recognized are available to longshoremen injured on navigable waters and those injured ashore, whether in service of a ship or not.[13] In part, this differential treatment stems from the geographical and historical accident that personal injuries on land are covered, for the most part, by state substantive law while such injuries on navigable water are generally governed by federal maritime law. These two bodies of law do overlap and interpenetrate in some situations, and the amphibious nature of the longshoreman's occupation creates frequent taxonomic problems. In the present case, however, the typical elements of a maritime cause of action are particularly attenuated: respondent Law was not injured by equipment that was part of the ship's usual gear or that was stored on board, the equipment that injured him was in no way attached to the ship, the forklift was not under the control of the ship or its crew, and the accident did not occur aboard ship or on the gangplank. Affirmance of the decision below would raise a host of new problems as to the standards for and limitations on the applicability of maritime law to accidents on land. At least in the absence of explicit congressional authorization, we shall not extend the historic boundaries of the maritime law." (404 U.S. pp. 212-214 [fn. 13 omitted] [30 L.Ed.2d pp. 391-393].)

However, throughout its opinion the Supreme Court recognized that *Gutierrez* v. *Waterman S.S. Corp.*, 373 U.S. 206 [10 L.Ed.2d 297, 83 S.Ct. 1185] was still good law. In *Gutierrez* a longshoreman was injured on a pier when he slipped on beans that had been spilled from a defective cargo carrier being unloaded from a ship. The Supreme Court said two questions were involved. (1) Whether the doctrine of unseaworthiness applied to defective cargo containers: it answered this question in the affirmative saying it was not a case of first impression. After citing many precedents it concluded at page 213 [10 L.Ed.2d at page 303]: ". . . Seaworthiness is not limited, of course, to fitness for travel on the high seas; it includes fitness for loading and unloading.

". . . . . . . . . . . . . . .

"These cases all reveal a proper application of the seaworthiness doctrine, which is in essence that things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." (2) The second question was whether the shipowners warranty of seaworthiness extends to longshoremen on the pier who are unloading the ship's cargo. The court described that question as a case of first impression so far as the Supreme Court was concerned. The court referred to *O'Donnell* v. *Great Lakes Co.*, 318 U.S. 36 [87 L.Ed. 596, 63 S.Ct. 488],

where seamen were permitted to recover for the shipowner's negligence under the Jones Act despite the fact that the seamen were on shore and to *Seas Shipping Co.* v. *Sieracki*, 328 U.S. 85 [90 L.Ed. 1099, 66 S.Ct. 872], "where longshoremen aboard ship doing seamen's tasks were permitted to recover for unseaworthiness, the court held that the tort of unseaworthiness arises out of a maritime status or relation and is therefore 'cognizable by the maritime [substantive] law whether it arises on sea or on land.' Accordingly, the court permitted recovery for unseaworthiness." (*Gutierrez, supra*, at p. 214 [10 L.Ed.2d at pp. 303-304].)

In the case at bar the court found that the gantry crane on the dock was adopted by the vessel as a substitute for its own boom which ships normally carry on board for loading and unloading operations. The Supreme Court in *Gutierrez, supra*, recognized that "seaworthiness" "includes fitness for loading and unloading." Thus the case at bar presents a situation where longshoremen engaged in the work of seamen under the direction of the ship's officers and crew are killed or injured on a pier because of defective equipment used to load a ship which equipment was not seaworthy and which equipment the ship had adopted as its own equipment. Under these conditions we are of the opinion that the principles enunciated in *Gutierrez, supra*, permit recovery against the shipowner-operator Dreyfus and that such recovery is not precluded by anything which the Supreme Court said in *Victory Carriers*. In *Victory Carriers* the court at page 204 [30 L.Ed.2d at page 386] said: "More precisely, the threshold issue is whether maritime law governs accidents suffered by a longshoreman who is injured on the dock by allegedly defective equipment owned and operated by his stevedore employer." In *Victory Carriers*, the longshoreman was performing the services of a longshoreman not the services of a seaman. In *Victory Carriers*, the longshoreman was injured by pier-based longshoreman's equipment (a forklift) and not by pier-based equipment which the vessel had adopted as its own to discharge a loading function normally performed by the ship's own loading equipment.

Under the findings of the trial court in the case at bar, Green and Harris were not longshoremen but "seamen" (rendering the services of seamen) and the defective equipment was not stevedore equipment but equipment which the vessel had adopted as its own.

■ Dreyfus and the various other defendants argue that the judgment should be reversed because the trial court exercised admiralty jurisdiction and the state courts are prohibited by federal law from exercising admiralty jurisdiction. The vice of the argument is that it assumes the critical fact— that the trial court exercised admiralty jurisdiction. We do not think so.

The accident did not occur on navigable waters within the admiralty jurisdiction of the United States. It occurred on the pier within the territorial jurisdiction of the State of California. Green and Harris were citizens of the State of California. The trial court had in personam jurisdiction of Dreyfus. The court did not attempt to exercise any jurisdiction over the vessel or enforce any process outside its territorial limits. The court was simply defining the standard of care which Dreyfus owed Green and Harris.

Let us use an illustration: suppose a vessel loading ammunition explodes because of an unseaworthy condition and projectiles from the exploding ammunition cover a wide area causing personal injuries to seamen on board the vessel, seamen on board other vessels in the harbor and private citizens asleep in their beds in their homes miles from the waterfront. The consequent damage occurs within an area subject to the admiralty jurisdiction of the United States and an area within the territorial jurisdiction of a state. Can it be said that the shipowner should be held to a different standard of care towards the people on land within the territorial limits of the state than it owes to its own seamen and the seamen on board other ships on navigable waters within the jurisdiction of the United States? In our view the state does not exercise admiralty jurisdiction merely because it holds as a matter of its own domestic tort law that the shipowner over whom it has in personam jurisdiction owes the same standard of care toward all persons who are injured as a consequence of its single act or omission. A state does not exercise federal jurisdiction merely because it applies a federal standard of care. If the accident had occurred in Arizona and the action was filed in California, California would not exercise Arizona jurisdiction merely because it applied an Arizona standard of due care.

The case at bar is an a fortiori case. Not only did the accident occur within the territorial limits of California, but at the time Green and Harris, although longshoremen, were performing the services of seamen under the direction and control of the officers and crew of the ship. Under such circumstances, in our view, the trial court did not act in excess of its jurisdiction when it concluded that Dreyfus owed the same standard of care to the longshoremen serving as seamen which it owed to its own seamen serving as seamen.

Our conclusion does no violence to the principles enunciated in *Victory Carriers*. In this case the trial court recognized the gangplank as the line of demarcation between state and federal jurisdiction. It did not usurp federal jurisdiction nor did it surrender California jurisdiction. The question is not one of jurisdiction but a question of what standard of care is

required of a person over whom California has unquestioned in personam jurisdiction. Surely Dreyfus should not be permitted to successfully argue that it has a different and lower standard of care toward "seamen" within California jurisdiction than it has toward seamen within federal jurisdiction. Our conclusion is compatible with federal law. It imposes no additional or different burden on interstate or foreign commerce. It is recognized by the United States Supreme Court in *Southern Pacific Co.* v. *Jensen,* 244 U.S. 205 [61 L.Ed. 1086, 37 S.Ct. 524; see Pitney, J. dissenting opinion]; *Chelentis* v. *Luckenbach S. S. Co.,* 247 U.S. 372 [62 L.Ed. 1171, 38 S.Ct. 501]; and *Pope & Talbot, Inc.* v. *Hawn,* 346 U.S. 406 [98 L.Ed. 143, 74 S.Ct. 202]. In effect, it is consistent with the federal standard of care under the Saving to Suitors Act of Congress, 28 United States Code, section 1333, and the Admiralty Extension Act of 1948, 46 United States Code, section 740; see also, The Law of Admiralty by Grant Gilmore and Charles L. Black, Jr., "rules of maritime law displace rules of common law in actions brought under the saving to suitors clause in nonadmiralty courts." (P. 374.) Whether we apply federal admiralty law or California tort law both results hold Dreyfus to the same standard of care. (See also *Bozanich* v. *Jo Ann Fisheries, Inc.,* 270 Cal.App.2d 178 [75 Cal.Rptr. 463].)

The crux of the appeal of Dreyfus is its contention that the court had no legal or factual basis for finding that Dreyfus had breached its warranty of seaworthiness because the crane was defective. Dreyfus argues that the defective crane was shore-based stevedore equipment under the control of shore-based personnel and that the warranty of seaworthiness by Dreyfus does not embrace such equipment. Green and Harris argue that the federal courts have long recognized a principle that when defective stevedore equipment is used to perform functions normally and traditionally performed by a ship with its own equipment, it cannot escape liability by claiming the defective equipment belonged to someone else. Green and Harris cite *Alaska Steamship Co.* v. *Petterson,* 347 U.S. 396 [98 L.Ed. 798, 74 S.Ct. 601], affirming per curiam 205 F.2d 478, and *Rogers* v. *United States Lines,* 347 U.S. 984 [98 L.Ed. 1120, 74 S.Ct. 849], reversing per curiam 205 F.2d 57, both of which were cited with approval in *Victory Carriers.* Green and Harris point out that the Ninth Circuit relied upon *Rogers* and *Petterson* to hold that a vessel adopted a dockside gantry crane and conveyor assembly in *Huff* v. *Matson Navigation Company,* 338 F.2d 205. Green and Harris argue that in the case at bar the gantry crane and K Belt were literally an "umbilical cord" which enabled the *La Marea* to operate and without such equipment the vessel would have been useless. That under such circumstances such "umbilical cord" was unlike the

defective forklift involved in the *Victory Carriers* case which merely deposited cargo on the dock where it could be picked up by the ship's equipment. Our function as an appellate court is neither to agree nor disagree but to determine whether or not there was a factual basis for the trial court's determination to that effect. In our opinion there was. We think there would have been little doubt if the defective crane had broken while the K Belt was above seamen on board the vessel and the dead and injured "seamen" had been part of the ship's regular crew. (*Seas Shipping Co.* v. *Sieracki,* 328 U.S. 85 [90 L.Ed. 1099, 66 S.Ct. 872].) Under the facts here presented Green and Harris were "seamen" and the result should be the same. The judgment against Dreyfus should be affirmed.

### C. *Liability of Link-Belt*

Link-Belt's first assignment of error is that the court erred in refusing to sustain Link-Belt's objection to proposed findings and in refusing Link-Belt's request for special findings. Despite the devotion of over 30 pages of its brief to this argument, Link-Belt does not make a single reference to any portion of the voluminous record (7 volumes consisting of 1,619 pages) which sustains its objection to proposed findings or supports its request for alternate findings except to quote paragraph 13 of the secondary berth assignment and paragraph 10 of a lease agreement between City and Mortimer & Wallace regarding use of the conveyor belt facility. Respondents, on the other hand, cite in their brief appropriate portions of the record which support each material finding of the trial court. ■ An appellate court is not required to search the record to determine whether or not the record supports appellants' claim of error. It is the duty of counsel to refer the reviewing court to the portions of the record which support appellants' position. (*Foreman & Clark Corp.* v. *Fallon,* 3 Cal.3d 875 [92 Cal.Rptr. 162, 479 P.2d 362]; *Fox* v. *Erickson,* 99 Cal.App.2d 740 [222 P.2d 452]; *Firemen's Ins. Co.* v. *Indermill,* 182 Cal.App.2d 339 [6 Cal.Rptr. 469]; *Pittman* v. *Boiven,* 249 Cal.App.2d 207 [57 Cal.Rptr. 319]; *Brown* v. *World Church,* 272 Cal.App.2d 684 [77 Cal.Rptr. 669, 45 A.L.R.3d 622]; *Williams* v. *Williams,* 14 Cal. App.3d 560 [92 Cal.Rptr. 385].)

■ The duty of the trial court was to make findings on all material issues in order that the parties and appellate court may determine the factual basis for the court's decision. *DeArmond* v. *Southern Pacific Co.,* 253 Cal.App.2d 648, 658 [61 Cal.Rptr. 844]; *San Luis Obispo Bay Properties, Inc.* v. *Pacific Gas & Elec. Co.,* 28 Cal.App.3d 556 [104 Cal.Rptr. 733]; Code of Civil Procedure, section 634, relied upon by

Link-Belt prevents the application of the doctrine of implied findings on appeal. We are not here concerned with implied findings since the court made explicit findings on all material issues which we summarize in detail in the margin.[4]

---

[4]The court found that City entered into a contract with Grain Terminal to supply a conveyor system. In accordance with the contract City advertised for proposals the specifications providing that "the last leg of the system conveying material to the vessel could be supported by either a new or used crane." These specifications further provided as follows: "A used gantry crane may be acceptable, if approved by the Chief Harbor Engineer; however, the Contractor must provide a one-year guarantee as to condition, parts and operation, as if the crane were new. In any case, only new electrical wiring in conduit of good condition and new dust tight control panels will be acceptable. All wire cable used on the crane shall be new plow steel and certified as to proper strength."

Link-Belt submitted the lowest proposal proposing to supply a used crane. The court also found that Link-Belt knew how the crane was to be used; the used crane which Link-Belt supplied was built in 1931 had a capacity of 5 tons at a 51-foot radius; when Link-Belt purchased the crane it was disassembled; Link-Belt reassembled it and performed reconditioning work; Link-Belt modified the luffing drum assembly, it substituted a 5-horsepower alternating current motor for a 15-horsepower direct current motor and installed a gear reduction system between the 5-horsepower motor and the original western gear assembly; the new motors and reduction gear were mounted on a new base as part of the luffing drum assembly; Link-Belt substituted a 70-foot boom for the original 50-foot boom and installed new electrical controls, electric motor and additional gear drives connecting the motors to the final reduction gears of the purchase cable drum and the luffing cable drum assemblies and attempted to increase the load capacity from 5 tons to over 14,000 pounds by adding 3,000 additional pounds to the counterweight of the crane; Link-Belt did not test or inspect or otherwise ascertain the effect that the attempted increased capacity had on the crane's mechanical parts, gear drives or other components. In 1961 prior to the date of acceptance of the crane by City, the left front foot of the gear reduction drive housing (a part of the original crane) fractured; this was a component of the luffing cable drum assembly and the drive component; the fracture was repaired at the request of Banning. Link-Belt had knowledge of the fracture and repair in the fall of 1961 prior to acceptance of the crane by City; Link-Belt, in response to complaints by operators of the crane and at the request of the State of California, conducted lifting tests using a dynamometer to ascertain at what load weight the crane would tip; Link-Belt determined the tipping weight point to be 14,970 pounds and rated the crane at 7.5 tons at a 51-foot load radius; it was proper practice during the period of 1959-1962 for the seller of a used crane to conduct visual and scientific tests of the critical parts of the crane components including the luffing cable drum assembly and specifically the shaft; Link-Belt made no such tests; and it was proper practice during such period upon notice by the seller of a used crane that the left front foot of the gear reduction drive assembly housing had fractured to conduct visual and scientific tests to determine the cause, nature and extent of damage particularly to the luffing cable drum assembly and shaft and to test its alignment; Link-Belt made no such tests. When the crane was disassembled prior to delivery to City, Link-Belt did not disassemble the luffing gear assembly or perform any scientific tests such as magnetic particle, ultrasonic or die penetrate test "on the critical parts of the luffing cable drum including the luffing cable drum drive shaft" (shaft) which later failed. Link-Belt did not furnish City with an operator's manual, maintenance manual, operator's instructions, maintenance instructions or any instructions verbal or written; Link-Belt knew City's purpose in

■ It is clear that the findings of the court were sufficiently specific and detailed to justify holding Link-Belt liable for the accident on the theory of negligence, strict liability in tort and for breach of implied warranty.

The evidence was sufficient to support the findings on each of the three theories of liability. Under such circumstances we may not substitute our views for those of the trial court. (*Bancroft-Whitney Co.* v. *McHugh*, 166 Cal. 140 [134 P. 1157]; *De Vrahnos* v. *George*, 203 Cal.App.2d 210 [21 Cal.Rptr. 481].) ■ Link-Belt argues that since it was liable on an express written warranty of a "like new" condition for only one year, it could not be held liable after the express one year. The law is otherwise. (*Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; *Pike* v. *Frank G. Hough Co.*, 2 Cal.3d 465 [85 Cal.Rptr. 629, 467 P.2d 229].)

■ Link-Belt argues that City was an active tortfeasor and was primarily liable to plaintiffs. This argument seems to be predicated on the fact that City was the owner and lessor of the equipment. This is an argument which might well have been made by plaintiffs. (*Fakhoury* v.

acquiring the crane and impliedly warranted the crane was suitable for the intended use and expressly warranted that the crane was as good as new. The court found: that originally the K Belt weighed 14,970 pounds but Link-Belt reduced the weight to 12,250; the shaft on the crane failed because of a fracture; that the proximate cause of the fracture was a fatigue crack which started several years prior to March 30, 1968 and progressed to the point of failure at the time of the accident; a metal fatigue failure of the shaft began several years prior to March 30, 1968: at the time of failure the load bearing capacity of the shaft was less than was required to hold the K Belt; that when Link-Belt supplied the crane to the City it knew it would be used without inspection for defects by the owner, operator or user and that the shaft would not be visually inspected or disassembled; that the crane was defective in design and manufacture at the time it was delivered to City; that Link-Belt should have had the crane inspected by an engineer familiar with stress fatigue cycles and other such metallurgical and engineering facts as would be encountered in normal operations; Link-Belt should have known the shaft on the crane was defective if it had used accepted and known principles and procedures of engineering design and metallurgical arts which were known to it; that City did not misuse the crane; the shaft of the crane was negligently and improperly designed and machined in many specific areas, some of which we have already noted, that the failure of the shaft was the direct and proximate result of the fatigue cracking; neither Green nor Harris were aware of defects and had no opportunity to discover or guard against; City did not know and should not have known of defects in the shaft which caused the accident; the crane was used in the way intended; there was no negligence on the part of the owner, lessee or operator of the crane and no contributory negligence or assumption of risk on the part of Harris or Green. Link-Belt impliedly warranted that the crane and all its parts were reasonably safe and fit for the intended use and were of good and merchantable quality. The crane was dangerous and defective; was not of good and merchantable quality and was not reasonably fit for the intended purpose. The court then made specific findings on each element of damage sustained as a proximate result of the accident.

*Magner,* 25 Cal.App.3d 58 [101 Cal.Rptr. 473]; *Price* v. *Shell Oil Co.,* 2 Cal.3d 245 [85 Cal.Rptr. 178, 466 P.2d 722]; *McClaflin* v. *Bayshore Equipment Rental Co.,* 274 Cal.App.2d 446 [79 Cal.Rptr. 337].) Whatever the duty may be as between a lessor and injured third persons, as between the lessor and the seller, the seller has the primary responsibility in the absence of negligence by the lessor. We equate a lessor with a retailer. (*Pearson Ford Co.* v. *Ford Motor Co.,* 273 Cal.App.2d 269 [78 Cal.Rptr. 279].) Under the findings of the court which recite the extensive modifications which Link-Belt made in the crane prior to the sale to the City, Link-Belt in our view was tantamount to a manufacturer insofar as liability here is concerned. (*Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].)

Link-Belt also argues that City was primarily liable because it failed to undertake certain tests which the state requested. Whether or not such alleged failure constituted negligence and a superseding cause between successive wrongdoers was an issue of fact which the trial court resolved against Link-Belt. (*Balido* v. *Improved Machinery, Inc.,* 29 Cal.App.3d 633 [105 Cal.Rptr. 890].) ■ Under the findings City was not the operator of the crane or negligent in any way in connection with the defective crane. Since Dreyfus was found to be liable to plaintiffs as hereinabove indicated, City was held liable to Dreyfus on the maritime doctrine of implied warranty of workmanlike performance. (*Ryan Co.* v. *Pan-Atlantic Corp.,* 350 U.S. 124 [100 L.Ed. 133, 76 S.Ct. 232]; *Italia Soc.* v. *Ore. Stevedoring Co.,* 376 U.S. 315 [11 L.Ed.2d 732, 84 S.Ct. 748]; *DeGioia* v. *United States Lines Company,* 304 F.2d 421.) Such liability was not based upon any concept of negligence or knowledge of defective condition. Under such circumstances the party obligated on such a passive basis has a right of implied indemnity against the persons primarily or actively at fault. (*Pearson Ford Co.* v. *Ford Motor Co.,* 273 Cal.App.2d 269 [78 Cal.Rptr. 279]; *Ferrel* v. *Vegetable Oil Products Co.,* 247 Cal. App.2d 117 [55 Cal.Rptr. 589]; *Aerojet General Corp.* v. *D. Zelinsky & Sons,* 249 Cal.App.2d 604 [57 Cal.Rptr. 701]; *Markley* v. *Beagle,* 66 Cal.2d 951 [59 Cal.Rptr. 809, 429 P.2d 129]; *Muth* v. *Urricelqui,* 251 Cal.App.2d 901 [60 Cal.Rptr. 166].) The fact that the court might have found City liable to plaintiff on other possible theories may not be assigned as error by Link-Belt. (*Swails* v. *General Elec. Co.,* 264 Cal.App.2d 82 [70 Cal.Rptr. 143].)

■ Link-Belt argues that City should be held liable as an employer. Our attention is directed to no facts which would form the basis for holding City liable as an employer under the Labor Code. The City merely occupied the passive role of a landlord. The City was under no duty by

law or contract to load the *La Marea*. It leased space and equipment to Grain Terminal and allowed the ship to berth at its dock. It had no control of the vessel or the equipment used to load it. There was no basis for holding the City liable as an employer. (*Stanford* v. *City of Ontario,* 6 Cal.3d 870 [101 Cal.Rptr. 97, 495 P.2d 425].) The City was properly held liable for the unsafe condition of its property. (*Stanford* v. *City of Ontario, supra.*)

■  Lastly, Link-Belt complains that the trial court did not interpret the one-year "good as new" provision of the contract under which it sold the crane to City. No such finding was required since it was not relevant to the issues. The court did not base its judgment against Link-Belt on an express warranty but on theories of implied warranty, implied indemnity, negligence and strict liability in tort. Under these circumstances the proper interpretation of a one-year express warranty was meaningless.

### D.  *Liability of City and Grain Terminal*

What we have said thus far disposes of most of the contentions of City and Grain Terminal. City and Grain Terminal were held liable to Dreyfus for supplying defective equipment (City as Lessor and Grain Terminal as Lessee) for use by Dreyfus which proximately caused damage to plaintiffs. The court found that City and Grain Terminal were liable solely for breach of the maritime warranty of workmanlike performance. City and Grain Terminal were allowed implied indemnity against Link-Belt because City and Grain Terminal were only passively liable not actively negligent and Link-Belt was primarily liable and actively negligent.

Grain Terminal complains that it should not have been held liable to Dreyfus because it did not exercise and did not have the legal right to exercise any of the functions of a stevedore. Grain Terminal was not held liable to Dreyfus for any active negligence but simply because the equipment it supplied for use in the loading operation was defective. Under the contractual arrangements between City and Grain Terminal dated July 20, 1959 (defendants' exhibition GG), Grain Terminal was given the right "to use secondarily, subject to the prior rights of the preferential assignee thereof, the wharf at berth 174, for the purpose of operating, maintaining, repairing and using thereon a movable overhead grain loading and unloading facility, owned by the City of Los Angeles, for the handling of grain and similar commodities and for purposes incidental thereto" (defendants' exhibit GG) for a term of 20 years. Grain Terminal entered into contractual relations with Metropolitan (or its predecessor) to serve as stevedore in the actual loading, unloading operation. Under paragraph 2 of the agreement between City and Grain Terminal, the City agreed to

construct "a suitable waterside conveyor installation for the loading and unloading of grain and similar commodities between the waterside of the wharf at berth 174 and parcel number 1" (where Grain Terminal maintained its bulk storage facilities) and after construction by the City, Grain Terminal was given the right "to operate, maintain, repair and use said conveyor facility and installation." If Grain Terminal surrendered that right in its contractual relations with Metropolitan that surrender could not reduce the rights of City. Under paragraph 10 of the agreement between City and Grain Terminal, Grain Terminal expressly agreed to indemnify and hold City harmless from any and all claims for death or injuries to persons resulting from among other things the "operation, maintenance, use or occupation of the aforesaid premises, facilities, structures and installation by" Grain Terminal under the permit. Neither the trial court, the City nor Grain Terminal made any special point of such express indemnity and neither will we except to note that insofar as Dreyfus and City are concerned, Grain Terminal is hardly in a position to complain that the court allowed implied indemnity in favor of Dreyfus against Grain Terminal since Grain Terminal had an express obligation in that regard so far as City was concerned.

Under all of the circumstances we conclude that the court properly allowed initial recovery against Dreyfus and Link-Belt; that it properly allowed Dreyfus to recover against City, Grain Terminal and Link-Belt for any portion of the judgment that it might be compelled to pay, including attorneys fees, and costs and that it properly imposed ultimate liability on Link-Belt by allowing City and Grain Terminal to recover from Link-Belt any portions of the judgment including attorneys fees and costs, that they might be required to pay.

The trial court is empowered to award attorneys fees on appeal consistent with the judgments below. (See *T.E.D. Bearing Co.* v. *Walter E. Heller & Co.*, 38 Cal.App.3d 59, 64-65 [112 Cal.Rptr. 910].)

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.

Petitions for a rehearing were denied August 21, 1974, and the judgment was modified to read as printed above. The petitions of appellants Louis Dreyfus & Company and Link-Belt Division of FMC Corporation for a hearing by the Supreme Court were denied September 25, 1974.