[No. D011944. Fourth Dist., Div. One. Mar. 18, 1991.]

JEFFREY PAUL JONES, Plaintiff and Appellant, v.
ROBERT KEPPELER et al., Defendants and Respondents.

**COUNSEL**

Stanley L. McDonald for Plaintiff and Appellant.

Hillsinger & Costanzo, Foster Furcolo, Jr., Krimen, Bjornsen & Klein and Charles W. Savage for Defendants and Respondents.

## OPINION

**WIENER, Acting P. J.**—As a general rule an employee injured in the course and scope of his or her employment must proceed administratively through the workers' compensation system to obtain the benefits provided by the Workers' Compensation Act, Labor Code section 3200 et seq.[1] (§ 3600, subd. (a).) There are statutory exceptions to this general rule, however, authorizing the injured employee to attempt to augment the workers' compensation benefits by bringing a legal action against the employer to recover tort damages.[2] (§§ 3602, 3706, and 4558.) Here, plaintiff Jeffrey Paul Jones sued his employers Robert and June M. Keppeler, doing business as Cal Metal Manufacturing (collectively Cal Metal) under section 4558[3] alleging his injuries were "proximately caused by [his] employer's knowing removal of, or knowing failure to install, a point of operation guard on a power press" where the "manufacturer [had] designed, installed, required or otherwise provided by specification for the attachment of the guards and conveyed knowledge of the same to [Cal Metal]." (§ 4558, subds. (b) and (c).) In a summary judgment proceeding the court determined the undisputed facts precluded application of the statute and entered judgment in favor of Cal Metal. Jones appeals. We affirm based on the text of the statute and our interpretation of the legislative purpose underlying its enactment.

### FACTUAL BACKGROUND

Jones injured his hand at work while operating a power press manufactured by L & J Press Corporation. L & J sold the machine to Rohr in 1956.

---

[1] All statutory references are to the Labor Code unless otherwise specified.

[2] When tort damages are assessed or in the event of a settlement the employer has the right to credit the compensation benefits paid against the judgment or settlement. (§ 3600, subd. (b).)

[3] Section 4558 provides in part:

"(b) An employee, or his or her dependents in the event of the employee's death, may bring an action at law for damages against the employer where the employee's injury or death is proximately caused by the employer's knowing removal of, or knowing failure to install, a point of operation guard on a power press, and this removal or failure to install is specifically authorized by the employer under conditions known by the employer to create a probability of serious injury or death.

"(c) No liability shall arise under this section absent proof that the manufacturer designed, installed, required, or otherwise provided by specification for the attachment of the guards and conveyed knowledge of the same to the employer. Proof of conveyance of this information to the employer by the manufacturer may come from any source."

Subdivision (a)(3) defines "Manufacturer" as "the designer, fabricator, or assembler of a power press."

Subdivision (a)(5) defines "removal" as "physical removal of a point of operation guard which is either installed by the manufacturer or installed by the employer pursuant to the requirements or instructions of the manufacturer."

Pursuant to Rohr's instructions, L & J Press supplied the press with foot controls and omitted the standard two-hand simultaneous control system.[4] The press did not contain a point of operation guard.

After using the power press for 20 years, Rohr modified it by removing the original control mechanism and installed a 2-hand control system manufactured by PSC Corporation. PSC mounted warning signs on the exterior of the power press, including one which stated the machine should not be operated with a foot switch without a point of operation guard. Rohr sold the used machine to Cal Metal in 1987. At the time of the sale the machine was equipped with the two-hand control system and the warning signs. Rohr also supplied Cal Metal with L & J Press's original service manual, indicating both hand and foot controls were part of the standard design of the press. Cal Metal later attached a foot press, without providing a point of operation guard.

### DISCUSSION

### I

An employer's liability under section 4558 is predicated upon the employee proving the manufacturer of the power press provided for and conveyed information about a point of operation guard. (§ 4558 subd. (c); see *Swanson* v. *Matthews Products, Inc.* (1985) 175 Cal.App.3d 901 [221 Cal.Rptr. 84].) Conceding he cannot satisfy this requirement with respect to the original manufacturer L & J Press, Jones seeks to hold Cal Metal liable because Rohr and PSC provided for and conveyed information about a point of operation guard. In *Swanson*, however, the court rejected the plaintiff's attempts to extend the code section to an employer who was informed of the need to install a point of operation guard by an entity, such as Rohr, which had purchased the press directly from the manufacturer. (*Swanson, supra*, 175 Cal.App.3d at pp. 906-907.) "Section 4558, subdivision (c) requires the plaintiff to prove that the manufacturer conveyed the information to the employer . . . Knowledge of specifications other than the manufacturer's is simply not relevant." (*Id.* at p. 907.)

Jones maintains *Swanson* is distinguishable because Rohr and PSC designed and installed a new control mechanism on the power press. Such

---

[4]A two-hand control mechanism prevents an operator from inadvertently reaching into the point of operation by requiring the operator to apply both hands to machine operating controls and locating such controls at such a distance from the point of operation that the slide stops before the operator can reach into the point of operation. (Cal. Code Regs., tit. 8 § 4208.) This mechanism differs from a point of operation guard because it does not serve as an absolute barrier between the machine and the operator. (Cal. Code Regs., tit. 8, § 4207.)

conduct, Jones contends, rendered Rohr and PSC "manufacturers" within the meaning of the section 4558.

■ The basic objective of statutory construction is to ascertain the purpose of the legislation and to effectuate that intent. (*Forrest* v. *Trustees of Cal. State University & Colleges* (1984) 160 Cal.App.3d 357, 362 [206 Cal.Rptr. 595].) The starting point for interpreting a statute is the language of the statute itself, giving the words their usual and ordinary meaning. (See *Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 501 [247 Cal.Rptr. 362, 754 P.2d 708].) In addition, we must construe legislation "in context, keeping in mind the nature and purpose of the statutory act." (*Ceja* v. *J. R. Wood, Inc.* (1987) 196 Cal.App.3d 1372, 1375 [242 Cal.Rptr. 531].) In so doing, we consider matters such as " ' "the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction." ' " (*San Diego Union* v. *City Council* (1983) 146 Cal.App.3d 947, 954 [196 Cal.Rptr. 45], citations omitted.)

Section 4558 was enacted as part of an extensive overhaul of the workers compensation system designed to address perceived inadequacies in the rules. Employees claimed benefits were too low, while employers and their insurers felt the system was too costly, particularly due to the increasing number of exceptions to the workers' compensation exclusive remedy rule. The resulting legislation reflected a carefully crafted compromise among employer, employee and insurer groups[5] providing increased benefits for injured workers and their families and the potential for decreased expenses for the employer by strengthening the exclusive remedy rules. In the final legislative package there were only four circumstances under which a worker could bring a civil action against the employer, including the power press exception at issue here.[6]

The language of section 4558 reflects the Legislature's careful drafting of the terms triggering the application of the statute. The code section subjects an employer to liability for "failing to install" a guard, defined as "omitting to attach a point of operation guard either provided or required *by the manufacturer*, when the attachment is required *by the manufacturer and made known by him or her* to the employer at the time of acquisition,

---

[5] These groups included the California Labor Federation, AFL-CIO, Teamsters, the California Applicants Attorneys Association, California Trial Lawyers Association, and Association of California Insurance Companies.

[6] The other circumstances under which an employee may sue include: (1) injury caused by the employer's willful physical assault; (2) injury aggravated by the employer's fraudulent concealment of the existence of the injury and its connection with employment; and (3) injury caused by a defective product manufactured by the employer and sold to a third party but used by the employee in his work. (See § 3602.)

installation, or manufacturer-required modification of the power press." (Italics added.) Subdivision (c) reiterates that *"no liability arises"* unless *"the manufacturer"* provides for and conveys information about the guard. Subdivision (a)(3) defines a manufacturer as "the designer, fabricator, or assembler of a power press." Subdivision (a)(4) in turn defines a "power press" as "any material-forming machine that utilizes a die which is designed for use in the manufacture of other products."

■ Given the statute's history and language, we reject Jones's contention that we should expansively interpret the term "manufacturer" to include *any* party that participates at any time in modifying a power press. Under the specific statutory definitions, neither Rohr nor PSC manufactured *the power press* which injured Jones.[7] Rather, PSC designed and installed a new control component to Rohr's 20-year-old power press.

Likewise contrary to Jones's assertions, the fact that the new component added by PSC was a type of safety device is insufficient to render PSC or Rohr a manufacturer *of the power press*. Under Jones's proposed construction, any party which repairs, replaces or even slightly modifies a safety feature of a power press would be labeled a manufacturer, including the employer itself. Such broad interpretation would expand section 4558 beyond its intended purpose and would be tantamount to eliminating the "manufacturer" requirement from the statute.

## II

Jones additionally relies on a line of products liability decisions dealing with liability for reconditioned products. He directs us primarily to *Green v. City of Los Angeles* (1974) 40 Cal.App.3d 819 [115 Cal.Rptr. 685], which held a seller of a used crane, who had performed "extensive modifications" to the crane, including substantial changes to the crane's weight capacity, was "tantamount" to a manufacturer and therefore strictly liable for injuries which occurred when the crane malfunctioned. While we agree a party who so completely modifies or reconditions a used product could be considered a manufacturer in certain circumstances, that situation is not presented here. Unlike *Green*, Rohr's modification did not create a "new" product, nor did it change the performance, capacity, purpose or use of the power

---

[7] In so concluding, we do not accept defendants' argument that a "manufacturer" within the meaning of section 4558 always refers to a single unique entity. As Jones points out, given the numerous stages involved in manufacturing a single product, it is possible that several distinct corporate entities could participate in the creation of a power press machine. We need not decide the issue here, however, since neither Rohr nor PSC was involved in the original manufacturing process nor was the machine so reconstituted as to classify Rohr as an "assembler."

press. Instead, the modification changed only the power press's operating controls. Given these undisputed facts, *Green* is inapposite.

### III

We must also assume the Legislature passed section 4558 with full knowledge of the law, including judicial decisions relevant to its subject matter. (See *In re Misener* (1985) 38 Cal.3d 543, 553 [213 Cal.Rptr. 569, 698 P.2d 637].) Both before and during the Legislature's consideration of whether to enact section 4558, the courts were applying the doctrine of strict liability in tort not only to manufacturers of products, but also to the various links in the commercial marketing chain including a retailer (*Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 262-263 [37 Cal.Rptr. 896, 391 P.2d 168]), a wholesale-retail distributor (*Barth v. B.F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 248-254 [71 Cal.Rptr. 306]), personal property lessors and bailors (*Price v. Shell Oil Co.* (1970) 2 Cal.3d 245, 250-253 [85 Cal.Rptr. 178, 466 P.2d 722]), and a licensor of personalty in the form of coin-operated washing machines (*Garcia v. Halsett* (1970) 3 Cal.App.3d 319, 324-336 [82 Cal.Rptr. 420]). Given this well-known application of products liability to nonmanufacturer entities, the Legislature could have easily included such entities within the statute. Instead, the definition of a "manufacturer" was limited to an entity which designs, fabricates or assembles a power press. Given the broad scope of products liability, such express limitation supports our interpretation of the term "manufacturer" in this context.

Jones argues an interpretation which bars him from bringing a civil action is particularly harsh since the warning signs on the exterior of the power press clearly informed his employer that a point of operation guard was essential. He logically says Cal Metal's culpability on the facts of this case is identical to that contemplated by section 4558 and that denying him tort damages unfairly rewards his employer for no other reason than the manner through which it purchased the power press. Frankly we agree. However, our personal views and our conclusion that the class of persons protected by section 4558 may be underinclusive is irrelevant to our decision. It is the Legislature's determination that is controlling. It is clear the Legislature did not intend *all* workers injured by the absence of a point of operation guard to bring a legal action. Rather, it intended to provide relief only for a specific portion of those employees—workers whose employer knowingly failed to install or removed guards from a machine where the original manufacturer designed the machine to have a protective guard while in operation. In the give-and-take of the legislative process the Legislature decided that employees such as Jones injured by their employer's failure to comply with general industry safety orders pertaining to point of

operation guards and devices (Cal. Code Regs., tit. 8, §§ 10440, 10445) would be limited to the increased benefits provided by the Workers' Compensation Act for the employer's serious and willful misconduct. (§ 4553.) We therefore conclude the statute's limited scope is thus a legitimate compromise among the numerous groups competing for legislative favor.

## DISPOSITION

Judgment affirmed.

Todd, J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 6, 1991. Mosk, J., was of the opinion that the petition should be granted.