Filed 2/24/15  Marriage of McCourt CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of JAMIE McCOURT and FRANK H. McCOURT | B254182 |
| _____ | (Los Angeles County |
| JAMIE McCOURT, | Super. Ct. Nos. BC509736 and BD514309) |
| Appellant, | |
| v. | |
| FRANK H. McCOURT, | |
| Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Scott M. Gordon, Judge.  Affirmed.

Cotchett, Pitre & McCarthy, Joseph W. Cotchett, Philip L. Gregory and Camilo Artiga-Purcell, for Appellant.

Horvitz & Levy, Jon B. Eisenberg and Curt Cutting; Susman Godfrey, Marc M. Seltzer, Matthew R. Berry and Bryan J. Caforio, for Respondent.

In this marital dissolution action, former wife Jamie McCourt (Jamie) appeals from the trial court's order denying her motion to set aside the parties' marital settlement agreement (MSA) as well as the judgment incorporating that agreement.[1] The MSA was reached after two years of intense litigation and the stipulated judgment after several months of negotiation. Jamie moved to set aside the MSA and judgment on the grounds that (1) her former husband Frank McCourt (Frank) had misrepresented the value of the Los Angeles Dodgers baseball team and related assets, and (2) she had entered into the settlement based on the mistaken belief that those assets were worth only $300 million and the team's opportunity to create a regional sports network (RSN) was without value.[2] The court denied the motion. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Parties' Marriage and Professional Backgrounds*

Jamie and Frank met as freshmen at Georgetown University. They got married on November 3, 1979, or shortly after Jamie obtained her law degree from the University of Maryland. She subsequently went on to obtain a master's degree in business administration with a concentration in corporate finance from the Sloan School of Business at MIT. Jamie practiced law in New York and Massachusetts from 1979 to 1992 in the areas of corporate real estate and family law. Frank developed commercial real estate and, in 1994, Jamie started working as the general counsel for his businesses.

Jamie also served as a visiting professor at the UCLA Anderson School of Management. In addition, she was on the Board of Trustees for USC and the Los Angeles County Museum of Art (LACMA). At LACMA, she served on its Finance Committee.

---

[1] For simplicity and clarity, we refer to the parties by their first names. We intend no disrespect or undue familiarity.

[2] A RSN is a cable television station that presents sports programming to a local market.

In 2004, Frank bought the Los Angeles Dodgers baseball team (the Dodgers or team) which included Dodger Stadium and certain surrounding real estate (collectively, the Dodger Assets). Frank told Jamie that the Dodger Assets could be worth more than $2 billion. At the time, the Dodgers were subject to a contract with Fox Sports Net West 2, LLC (Fox) under which Fox was granted exclusive cable television rights until the end of the 2013 baseball season.

Jamie was appointed the vice chairman of the Dodgers until 2005 when she became president of the team. Between 2004 and 2009, Jamie assumed responsibility for the team's day-to-day management. In March 2009, she was appointed the chief executive officer of the Dodgers. While working for the Dodgers, Jamie reviewed a May 2009 "offering circular" drafted for a potential investor which valued the Dodgers at $963 million and the Dodgers' English-language television rights at $1.503 billion for a total value of $2.466 billion.[3] In late 2009, Jamie was fired from the Dodgers.

2. *The Divorce*

On October 27, 2009, Jamie filed for divorce. She was represented by six different law firms in this litigation. In addition, she hired forensic accountants, a "baseball expert," and multiple additional experts whose job was to advise her on the value of the Dodger Assets. At least one of her consultants had extensive experience in the sale of sports teams and the creation of RSNs.

---

[3] Jamie claims that Frank testified that "the high numbers in [the offering circular] had been premised on his acquiring additional sports teams in England and China, which never happened . . . ." However, the cited record does not show this. There are additional instances in Jamie's briefs where Jamie purports to set forth facts but does not support those facts by an accurate citation to the record. We disregard all such purported evidence. (See *Green v. City of Los Angeles* (1974) 40 Cal.App.3d 819, 835 ["An appellate court is not required to search the record to determine whether or not the record supports appellants' claim of error. It is the duty of counsel to refer the reviewing court to the portions of the record which supports appellants' position. [Citations.]"]; see also Cal. Rules of Court, rule 8.204(a)(1)(C) ["Each brief must . . . [s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."])

3

In January 2010, the parties served each other with preliminary statements of disclosures. Jamie's statement set forth a fair market value for the Dodgers of $962 million and noted that this value "d[id] not reflect the unrealized value of RSN rights which become available in 2013 and the value flowing from the development of the 276 acres surrounding Dodger Stadium. These entitlements could add hundreds of millions of dollars of additional value to these assets, at a minimum." Frank's preliminary statement disclosed that he owned 100% of the Dodger Assets and stated that the value of these assets was "T[o] B[e] D[etermined]."

The parties engaged in extensive discovery throughout the case. Jamie served twelve sets of document requests and took more than 40 volumes of depositions; Frank produced 220,000 pages of documents including detailed financial data regarding the Dodgers. Jamie repeatedly cited to such documents' valuations of the Dodger Assets and asserted, throughout the litigation, that these assets were worth at least $1 billion.

In February 2010, Jamie sought pendente lite support from Frank and argued that "Frank's September 30, 2008 personal financial statement set his net worth at $849,900,000 . . . [which] did not include . . . the present value of the future [] RSN[] . . . in May 2009, the McCourt Enterprise represented that the net equity value of its assets alone was in excess of $2 Billion." The following month, Jamie again represented to the court that the net value of the Dodgers was in excess of $2 billion.

When Jamie was deposed in July 2010, she was asked if Frank had told her, when he bought the Dodgers, that the team "could be worth between a billion and $2 billion," and she replied that "[Frank] actually thought that each independent property could be worth over a billion dollars . . . . " She further stated that, at that time, she believed the Dodgers were worth $1-2 billion and explained that this understanding was based on "what [Frank and I] perceived as the value of the RSN – well, the existing value, right, that we knew we were buying. We also knew that the RSN was coming up in 2014 . . . . [¶] We also understood that . . . the advanced media properties was worth a lot of money and increasing in value literally by the minute."

4

Jamie continued to opine that the Dodgers' media rights were of great value. For example, in August 2010, Jamie filed a trial brief stating that "[i]f the Dodgers decide in 2013 to terminate their contractual relationship with Fox and form their own RSN, which is Frank's plan, the value of that wholly-owned enterprise could be in excess of $1 billion . . . . " Six months later, Jamie's counsel wrote Frank's counsel stating that the "Dodgers' media rights" were "the key and most valuable asset . . . in this dissolution action."

On October 26, 2010, the parties' marriage was dissolved reserving jurisdiction over other issues.

### 3. *The Dodgers File for Bankruptcy*

In April 2011, the Major League Baseball (MLB) commissioner appointed a monitor to oversee the Dodgers' day-to-day operations, business and finances due to the MLB's "deep concerns regarding the finances and operations of the Dodgers." Shortly thereafter, the Los Angeles Times reported that the Dodgers were $500 million in debt and did not have the cash to meet payroll.

In May 2011, Jamie filed a motion to compel the sale of the Dodger Assets on the grounds that "Frank's ongoing mismanagement of the Dodgers will continue to devalue the team" and "it is probable that MLB will soon exercise its right . . . to take away full control of and <u>sell</u> the Dodger Assets." Jamie claimed that "[i]f MLB invokes its power to terminate the Dodgers franchise and sell the team, it is almost certain that Jamie and Frank will not receive the maximum value for these Assets."

Jamie further argued that "[t]he 'Dodger Assets' constitute the overwhelming bulk of Jamie and Frank's marital estate" and include "the valuable media properties and rights, the most notable of which is the Dodgers' current broadcasting contract with Fox that expires in 2013, and *the opportunity to start a [] RSN[]* after the Fox contract expires or prior thereto . . . . " (Emphasis added.) Jamie claimed that an extension of the Dodgers' contract with Fox had been valued by "public sources" at $1.6 billion, and that such a contract would, in fact, be worth more.

On June 17, 2011, Frank and Jamie agreed to settle their dispute on the condition that the MLB approve a proposed agreement between the Dodgers and Fox continuing their prior telecast rights agreement for 17 years. Under the agreement, Fox would pay the Dodgers approximately $1.7 billion in telecast rights fees. Frank and Jamie agreed to hold a trial on whether the Dodger Assets were community property, and to split those assets equally should the court conclude that they were.

On June 20, 2011, the MLB commissioner rejected the proposed agreement with Fox because the contract would prevent other parties from bidding on the Dodgers' media rights. The commissioner stated that it was in the Dodgers' long-term interest to wait until its contract with Fox expired in 2013, at which point the Dodgers "would likely have multiple offers to choose from and could fully maximize its rights fees through a competitive process . . . . "

On June 27, 2011, the Dodgers filed for bankruptcy claiming that it did not have funds available to pay its expenses. Jamie appeared in the case and was represented by counsel. The following month, the court appointed a mediator to manage the settlement negotiations between the Dodgers and the MLB.

4.     *The Three Months Before Jamie's and Frank's Settlement*

During the three months before the parties' settlement, they continued to engage in discovery and Jamie continued to represent to Frank and the court that the Dodger Assets were worth over $1 billion. On July 21, 2011, Frank produced a financial projection and valuation analysis of a Dodger RSN (the RSN Valuation Analysis) setting forth a present value of $1.5 billion for such a network.

In August 2011, the parties exchanged updated income and expense declarations. Jamie's income and expense declaration valued the Dodger Assets at $1.5 billion and stated that "[t]he precise market value is not known" and depends "in part on what the market reaction would be to a sale . . . . "

Frank's income and expense declaration (Frank's August 2011 Declaration) included a Statement of Financial Condition which valued his "equity in closely held businesses" at $293,950,000 as of June 30, 2010 and December 31, 2010. This

6

statement provided that "[n]o material chan[g]es in these interests occurred between June 30, 2010 and December 31, 2010" and referred the reader to the Statement of Value of Closely-Held Business Interests included with Frank's June 30, 2010 financial statement. That document had already been produced to Jamie and set forth a value for the Dodgers and attached real estate at $860 million exclusive of a RSN.

The $860 million figure included $160 million for the land surrounding the stadium and $700 million for the Dodgers and Dodger Stadium. The value of a Dodger RSN was expressly excluded from these figures. Frank's net equity in closely held businesses ($293,950,000) was reached by taking into account the approximately $600 million in debt attached to those assets. The total sum of the net value set forth for the Dodgers, stadium and real estate ($300 million), plus the $1.5 billion value placed on the RSN in the RSN Valuation Analysis, is $1.8 billion. Thus, several months before the parties' settlement, Frank had produced financial documents to Jamie estimating the net value of the Dodger Assets, including a RSN, as $1.8 billion.

On August 30, 2011, Signal Capital Management LCC offered $1.2 billion to buy the Dodger Assets. A week later, Jamie filed a brief in family court seeking attorney's fees from Frank and arguing that "the recent offer to purchase the Dodger Assets for $1.2 billion [] set[] the current floor" for the sale of these assets.

On September 16, 2011, the Dodgers filed a motion in the bankruptcy proceeding seeking approval of the sale of its cable television rights to the highest bidder notwithstanding that its telecast agreement with Fox required that the Dodgers first negotiate exclusively with Fox. The Dodgers claimed that "[t]he value of th[e] [cable television] rights is enormous" and that "when it is able to unlock that value" it could pay all its debts.

Fox objected to what it argued would be a premature sale of the Dodgers' cable television rights in violation of its agreement with the Dodgers, and argued that the proposed sale of the Dodgers' media rights would subject the Dodgers to "a damages claim of immense size." The MLB also objected on the grounds that a sale of the

Dodgers' media rights without MLB approval could lead to the team's "termination from the League . . . which would eliminate essentially all of [the Dodgers'] value."

On September 23, 2011, the MLB filed a motion seeking approval of a plan to market and sell the Dodgers.  On October 7, 2011, Frank's counsel told Jamie's counsel that Frank was considering selling the Dodgers as part of a settlement with the MLB.  Several days later, Jamie and Frank settled.

5.    *The Settlement Agreement and Stipulated Judgment*

The parties' settlement was formalized in a marital settlement agreement (MSA) signed on October 11, 2011.  The MSA provided that (1) Frank would pay Jamie $131 million in cash, (2) Jamie would receive approximately $50 million in real estate and personal property, (3) Frank would continue to pay Jamie $225,000 a month in spousal support until the $131 million was paid, (4) Jamie would release all claims to the Dodger Assets, (5) Frank would receive approximately $3 million in real estate, and (6) Frank would assume all tax liability associated with the parties' personal tax returns from the previous seven years.  The MSA further provided that the parties would waive the exchange of final declarations of disclosure and would stipulate to a judgment incorporating the terms of the MSA.

On November 2, 2011, the Dodgers publicly announced it had reached a settlement with the MLB which called for an open auction of the Dodger Assets overseen by a retired federal judge.  The following day, Jamie and Frank filed a stipulation requesting that the MSA be entered as an order of the court.  Later that month, Jamie filed proofs of claim in the bankruptcy action asserting her right to $131 million of the proceeds of any sale of the Dodger Assets.

In December 2011, the parties filed cross-motions to enter a judgment based on the MSA.  Frank argued that he was entitled to have the following recital in the judgment:  "the value of the Dodger Assets has been a contentious issue of dispute, with the parties having offered values ranging from $700 million to $3 billion."  Jamie objected to the proposed language on the grounds that "it is <u>unnecessary</u> given the agreed-upon protective language already contained in [the other] [r]ecitals . . . . "

The parties ultimately agreed on the following language: "the value of the Dodger Assets has been a contentious issue of dispute, with the parties having offered values covering a broad range. The parties acknowledge that they are willing to enter into this Stipulated Judgment regardless of the value that the assets may ultimately have, without any further discovery, and without an evidentiary hearing regarding the value of those assets." On January 12, 2012, the parties executed a Stipulated Judgment incorporating the terms of the MSA. The court entered the stipulated judgment on January 19, 2012 after both parties testified under oath that they freely and voluntarily entered into the terms of the MSA and the judgment.

On January 23, 2012, Guggenheim Baseball Management, L.P. (Guggenheim) made a $1.4 billion offer for the Dodger Assets. Guggenheim ultimately increased its bid to $2.15 billion and, on March 27, 2012, the Dodgers announced an agreement for the sale of the team, the stadium, and a partial interest in the land surrounding the stadium to Guggenheim. Two weeks later, Jamie appeared in the bankruptcy action and requested that she be paid $131 million directly from the sale proceeds. At the end of April 2012, Frank wired $131 million to Jamie. That same day, Jamie's counsel sent a letter to Frank's counsel claiming that Jamie had grounds to set aside the stipulated judgment.

6. *Jamie Moves to Set Aside the MSA and Stipulated Judgment*

On September 24, 2012, Jamie moved to set aside the MSA and judgment. She argued that Frank's August 2011 Declaration misrepresented the net value of the Dodger Assets as less than $300 million[4] and did not include the value of the potential

---

[4] In fact, Jamie made inconsistent claims in her motion about whether the $300 million set forth in Frank's August 2011 Declaration represented (1) the net value or (2) the fair market value of the Dodger Assets. On the one hand, Jamie acknowledged that one of her experts opined that the Dodger Assets had a "net equity value" of $500 million and compared that figure with the $300 million Frank set forth in his August 2011 Declaration suggesting that the figure also represented the assets' net value. On the other hand, she claimed that Frank represented that "the anticipated price" for the Dodger Assets was $300 million instead of $2 billion, which indicates that she believed the $300 million amount was the fair market value for the Dodger Assets.

9

RSN. In addition, Jamie claimed that Frank had failed to disclose the RSN Valuation Analysis to her and had concealed evidence of offers to buy the Dodgers. She subsequently dropped these latter claims; she acknowledged that the RSN Valuation Analysis had been produced and she failed to submit any evidence of undisclosed offers. Although Jamie also argued that Frank had falsely represented to her that he would never sell the Dodgers, she does not address this contention on appeal.

At the evidentiary hearing held on the motion, Jamie testified that when she signed the MSA she believed, based on Frank's misrepresentations, that the Dodger Assets had a net value of only $300 million and the potential RSN did not add any value. She also testified that she "had no idea" that the sale of the team by the MLB could affect the value of the team despite having previously argued to the court that this would result in a lower sales price.

The trial court found Jamie's testimony not credible and denied the motion as follows: "During the course of this marital dissolution litigation, the valuation and distribution of assets, including . . . the 'Dodger Assets,'[] has remained a primary issue in the case. [¶] Throughout the course of the case, the valuations and projections of revenue related to the Dodger Assets presented by the parties were far from consistent. Between uncertainty as to the feasibility and profitability of a proposed [RSN], complications leading to and arising out of a bankruptcy filing, and disputes with [the MLB] regarding management and control of the Dodger Assets, the proposed valuations fluctuated greatly . . . . [¶] Despite the uncertainty and speculation regarding the future of the Dodger Assets, the parties finalized a [MSA] that provided for the division and distribution of the parties' assets. . . . "

---

Yet Jamie also argues that the Dodgers had $600 million in debt. If Jamie believed both that the $300 million figure represented the assets' fair market value *and* that there was $600 million in debt to be accounted for, those assets would constitute a liability of -$300 million. On appeal, Jamie adopts the more coherent argument that Frank represented that the Dodger Assets had a "net value of $300 million." For the sake of clarity, we only address that claim.

10

"In this case, [Jamie] has failed to produce sufficient credible evidence to show that [Frank] concealed or misrepresented any information about the RSN or the Dodger assets. [Frank's] Income and Expense Declarations disclosed the existence of the RSN and the issues that are present in attaching a value to the as of then unrealized asset. . . . " In addition, "the element of reliance . . . is not met in the present case." "The evidence produced by both parties shows that they both knew well before the commencement of the dissolution proceedings, the viability and projected value of the [RSN] as an asset of the Dodgers. . . . Therefore, [Jamie] has failed to show that she was 'kept in ignorance or in some other manner was fraudulently prevented from fully participating in the proceeding.' (Fam. Code, [§] 2122(a).)"

"[Jamie] has [also] not shown that she made a mistake of a fact that existed at the time she signed the [MSA]." "[Jamie] states, 'When I signed the MSA and the Judgment, what I believed about RSN value was basically what Frank told me, i.e., that we couldn't count on the RSN for any added value and that the total net asset value was around $300 million.' As the evidence discussed shows, this testimony is not credible. . . . [¶] The evidence shows that [] during the period that the parties were working on the settlement of the case, the Dodger assets were in turmoil and subject to a proceeding in the Bankruptcy Court and substantially under the control of [MLB]. . . . [¶] The evidence further shows that the value of the Dodgers baseball team was in fact established by an auction supervised under the Bankruptcy case. . . . "

"[Jamie] has failed to present sufficient credible evidence to show that she did not have a full and complete understanding of the value or nature of the assets. . . . The evidence [] in this case shows that [she] had knowledge and evidence that the value of the Dodger assets was well in excess of the amount that she indicates she relied on in signing the [MSA]."

On these grounds, the motion was denied. Jamie timely appealed.

### CONTENTIONS

Jamie contends that the trial court erred in denying her motion to set aside the MSA and judgment because (1) Frank did not comply with the Family Code's

11

disclosure requirements, (2) "Frank engaged in fraud," (3) Jamie mistakenly believed the Dodger Assets were worth only $300 million when she entered into the MSA, and (4) Jamie was entitled to an equal division of assets under Family Code section 2601.[5]

## *DISCUSSION*

### 1.     *The Standard of Review*

Judgments adjudicating spousal support and the division of property may be set aside for the following grounds:  (1) "[a]ctual fraud where the defrauded party was kept in ignorance," (2) "perjury in the preliminary or final declaration of disclosure, the waiver of the final declaration of disclosure, or in the current income and expense statement," (3) duress, (4) mental incapacity, (5) mistake, or (6) "[f]ailure to comply with the disclosure requirements" of the Family Code.  (Fam. Code, § 2122.)  However, "before granting relief [from the judgment], the court shall find that the facts alleged as the grounds for relief *materially affected the original outcome* and that the moving party would materially benefit from the granting of the relief."  (Fam. Code, § 2121, subd. (b) [emphasis added].)

We review the trial court's denial of a motion to set aside a marital settlement agreement and judgment for abuse of discretion.  (*In re Marriage of Brewer v. Federici* (2001) 93 Cal.App.4th 1334, 1336.)  "The trial court's exercise of discretion will not be disturbed on appeal in the absence of a clear showing of abuse, resulting in injury sufficiently grave as to amount to a manifest miscarriage of justice.  [Citations.]" (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682.)

On appeal, we presume that the trial court's judgment is correct.  "All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown."  (*Denham v. Superior Court*

---

[5]     Jamie also argues, for the first time in her reply, that the court erred in not applying a presumption of undue influence.  We disregard this argument on the ground that " '[p]oints raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument.' [Citation.]" (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)

12

(1970) 2 Cal.3d 557, 564.) " '[T]he showing on appeal is wholly insufficient if it presents a state of facts . . . which . . . merely affords an opportunity for a difference of opinion. An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' [Citation.]" (*In re Marriage of Varner* (1997) 55 Cal.App.4th 128, 138.)

2.    *The Disclosure Requirements in a Marital Dissolution Action*

"The Family Code requires the parties to a dissolution proceeding to serve on each other a preliminary, sworn declaration, on forms prescribed by the Judicial Council, identifying all assets and liabilities. [Citation.]" (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 745.) This preliminary declaration of disclosure must set forth "(1) The identity of all assets in which the declarant has or may have an interest" and "(2) The declarant's percentage of ownership in each asset." (Fam. Code, § 2104, subd. (c).)

"Moreover, each party has a continuing duty to immediately, fully, and accurately update and augment that disclosure to the extent there have been any material changes . . . . " (Fam. Code, § 2100, subd. (c).) The parties must also serve on each other "a final declaration of disclosure" prior to entering into any agreement for the resolution of property issues "unless the parties mutually waive the final declaration of disclosure." (Fam. Code, § 2105, subd. (a).) The waiver is only valid to the extent the parties have exchanged preliminary declarations of disclosures and current income and expense declarations, and have fully augmented the preliminary declaration of disclosure. (*Id.*, subd. (d).)

Here, Jamie argues that Frank did not comply with the disclosure requirements because (1) his preliminary declaration of disclosure did not set forth a value for the Dodger Assets,[6] and (2) he never fully augmented his preliminary declaration of disclosure.

---

[6]    At oral argument, counsel for Jamie no longer maintained that omissions in Frank's preliminary declaration of disclosure provided grounds for setting aside the judgment.

a. *The Preliminary Declaration of Disclosure*

Jamie's first argument hinges on a parenthetical instruction contained in the Judicial Council form entitled Income and Expense Declaration. (See Judicial Council Form FL-150.) The preliminary declaration of disclosure must be provided to the other party with a completed income and expense declaration. (Fam. Code, § 2104, subd. (e).) The income and expense declaration form, in turn, asks the declarant to list his assets, including "[a]ll other property, real and personal," and further instructs the declarant to "*(estimate fair market value minus the debts you owe).*"

Judicial Council forms are adopted as rules of court for use in any proceeding under the Family Code. (Cal. Rules of Court, Rule 5.7(a); see also Fam. Code, § 211 ["the Judicial Council may provide by rule for the practice and procedure in proceedings under this code."]) The Judicial Council also has independent authority pursuant to Article VI of the California Constitution to "adopt rules of court administration, practice and procedure . . . not [] inconsistent with statute."

Here, the form at issue required Frank to list an estimated value for his personal property, and this form was effectively a rule of court. The record indicates that Frank did not comply with this instruction by providing a value for the Dodger Assets. Although Frank argues that Family Code section 2104 only requires a party to disclose the *identity* of all assets and the party's *percentage of ownership* of those assets, he was also required by the form to list an estimated fair market value for his personal property. Such a requirement is not inconsistent with Family Code section 2104, nor does Frank argue that it is.

However, Jamie did not establish that Frank's failure to complete the income and expense declaration attached to his preliminary declaration of disclosure "materially affected the original outcome" of the action.[7] (Fam. Code, § 2121, subd. (b).) Jamie

---

[7] We also note that, prior to the motion to set aside the judgment, Jamie never objected to the lack of valuation information in Frank's preliminary declaration of disclosure. When one party fails to provide the information required in a preliminary declaration of disclosure with sufficient particularity, the other party (if that party has

does not address this Family Code requirement, but simply argues that a party's failure to comply with the disclosure requirements in a dissolution action "automatically" entitles the other party to set aside the judgment. In support of this argument, she cites to Family Code section 2107 which provides that "[t]he failure to comply with the disclosure requirements does not constitute harmless error." (Fam. Code, § 2107, subd. (d).)

We reject Jamie's reading of Family Code section 2107 to the extent she argues that a party's failure to comply with the disclosure requirements automatically entitles the opposing party to set aside a judgment. Such an interpretation is directly inconsistent with Family Code section 2121's mandate that a party moving to set aside a judgment show that the error "materially affected the original outcome" of the case. (See *Dustin v. Superior Court* (2002) 99 Cal.App.4th 1311, 1320 [statutory schemes must be read as a whole, harmonizing their provisions].)

Furthermore, Jamie's reading of Family Code section 2107 is inconsistent with the constitutional mandate that no judgment be set aside unless there has been a miscarriage of justice. (See *Hutnick v. United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 466 ["statutes should be interpreted in a manner which avoids constitutional difficulties"].) "The California Constitution trumps any conflicting provision of the Family Code" and Article VI, section 13 provides that "[n]o judgment shall be set aside . . . unless . . . the error complained of has resulted in a miscarriage of justice." (See *In re Marriage of Steiner & Hosseini* (2004) 117 Cal.App.4th 519,

---

served a preliminary declaration of disclosure herself) may request "further particularity" from the noncomplying party. (Fam. Code, § 2107, subd. (a).) The complying party may also file a motion to compel a further response, file a motion preventing the noncomplying party from presenting evidence on issues that "should have been covered in the declaration of disclosure," or seek sanctions from the court. (Fam. Code, § 2107, subds. (b) and (c).) Here, Jamie did not avail herself of any of these remedies but waited for two years until after judgment had been entered to argue that Frank's preliminary declaration of disclosure was incomplete.

15

526-527; see also *In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56, 92 ["a showing of prejudice is still required despite [section 2107's] statutory language"].)

Here, Jamie does not argue that Frank's failure to provide her with a completed income and expense declaration with his preliminary declaration of disclosure prejudiced her or "materially affected the original outcome" of the case, nor could she credibly do so. Throughout the case, Frank augmented his preliminary declaration of disclosure with multiple documents setting forth values for the Dodger Assets. Accordingly, Jamie has not shown that the trial court abused its discretion in declining to set aside the judgment based on Frank's incomplete preliminary declaration of disclosure.

b.      *Frank's Augmentation of His Disclosures*

Jamie argues that Frank never fully or accurately augmented his preliminary declaration of disclosure because "[t]he only 'augmentation' Frank ever made was his August [] 2011 Declaration" which she argues understated the value of the Dodger Assets.[8] Jamie does not explain why she believes that Frank's August 2011 Declaration was the "only" augmentation of his preliminary declaration of disclosure. The trial court found that Jamie had "received voluminous material in the litigation that described the nature and value of the assets . . . ." In addition, the record indicates that Frank produced over 220,000 pages of documents to Jamie in this action which included

---

[8]      At oral argument, Jamie's counsel argued that Frank should have produced a particular document Blackstone Advisory Partners prepared for the Dodgers after the MSA was signed. This argument was not raised in Jamie's briefs. Jamie's opening brief mentions only in passing (in the Statement of Facts) that, unbeknownst to Jamie, a Blackstone executive stated that the $2.15 billion sales price for the Dodger Assets was anticipated as early as July 2011. Moreover, even if this argument was properly raised by Jamie, she still has not shown prejudice. The sum of the RSN Valuation Document's estimate of $1.5 billion for a RSN and the $849 million gross value for the Dodgers and attached real estate set forth in Frank's August 2011 Declaration is $2.36 billion. Accordingly, the values set forth by Frank in July and August 2011 for the Dodger Assets approximated the value Blackstone anticipated.

16

detailed financial data regarding the Dodger Assets. This production clearly augmented Frank's preliminary declaration of disclosure.[9]

Jamie also fails to show that Frank's August 2011 Declaration was inaccurate. While she argues that this declaration "omitted . . . the Dodger[] Assets, resulting in a vast understatement of the parties' asset value," the declaration simply repeated the value of Frank's "equity in closely held businesses" as originally stated in his June 30, 2010 Statement of Value of Closely-Held Business Interests. The declaration further stated that "[n]o material chan[g]es in these interests occurred between June 30, 2010 and December 31, 2010." Jamie does not argue that the June 30, 2010 statement – which valued the Dodgers and attached real estate at $860 million and indicated that such value "d[id] not reflect the value" for the development of a RSN – was inaccurate. When the RSN Valuation Analysis, produced by Frank in July 2011, is included, the net value of the Dodger Assets was estimated as $1.8 billion.

Jamie has also not shown that she was prejudiced by the purported inaccurate valuations set forth in Frank's August 2011 Declaration. First, Jamie does not address, in any meaningful manner, the trial court's findings that her testimony was not credible and that, in fact, Jamie "had knowledge and evidence that the value of the Dodger assets was well in excess of the amount that she indicates she relied on in signing the [MSA]." On appeal, we may not " 'reweigh evidence or reassess the credibility of witnesses. [Citation.]' [Citation.]" (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531.) Accordingly, we must defer to the trial court's determination that Jamie's testimony was not credible.

---

[9]     Jamie also briefly argues that Frank "failed to . . . mak[e] a written disclosure of his 'income-producing opportunity' to sell the Dodger Assets for a price far higher than he had represented." This argument is not supported by any citation to the record and, in fact, the record belies this assertion. The trial court found that during post-judgment discovery "*no* evidence was found *or submitted* of any undisclosed offers or bids to purchase the Dodgers." (Emphasis added.)

Second, other evidence in the record supports the trial court's finding that Jamie knew the net value of the Dodger Assets was in excess of $300 million when she signed the MSA. Jamie was a sophisticated businessperson, claimed that she "ran the day-to-day operations of the Dodgers" from 2004-2009, and was advised by multiple experts on the issue of the value of the Dodger Assets. Prior to the execution of the MSA, Jamie consistently represented that the Dodger Assets were worth approximately $1 billion exclusive of the value of a RSN and that a Dodger RSN had valuable potential. Even after Frank served Jamie with the August 2011 Declaration purportedly setting forth a net value for the Dodger Assets of $300 million, she represented to the trial court that the Dodger Assets would sell for at least $1.2 billion.

On these grounds, Jamie has not shown that Frank failed to fully or accurately augment his preliminary declaration of disclosure or that she was prejudiced by that purported failure.

3.     *Fraud*

To set aside a marital dissolution judgment for fraud, a party must show that "the defrauded party was kept in ignorance or in some other manner was fraudulently prevented from fully participating in the proceeding." (Fam. Code, § 2122, subd. (a).) Jamie first argues that the trial court erred in not applying a presumption of fraud based on Frank having received a larger share of the parties' assets. She cites to *Boyd v. Bevilacqua* (1966) 247 Cal.App.2d 272 where the court stated that any transaction by which a partner to a joint venture secures an advantage over another partner is presumptively fraudulent. (*Id.* at p. 290.) However, *Boyd v. Bevilacqua* is distinguishable in that it does not deal with a motion to set aside a marital dissolution judgment.

In fact, where a party seeks relief from a judgment that incorporates an unequal marital settlement agreement, that party bears the burden of proof under Family Code section 2122. (See *In re Marriage of Kieturakis, supra,* 138 Cal.App.4th at p. 88 ["those seeking to set aside judgments have always borne the burden of proof"].)

18

Accordingly, here, Jamie bore the burden of proof to show that the judgment was procured through fraud.

Jamie also argues that the court erred in denying the motion to set aside because "the evidence show[ed] Frank engaged in fraud," "the evidence shows Frank failed to disclose critical information, concealed important information, and materially misrepresented the facts concerning his dealings regarding the Dodger Assets," "there was misrepresentation and concealment of facts," "Frank disavowed his prior high estimates once the action started," "he made false and misleading statements about the value of the Dodger Assets," and "Frank did not make the required disclosures."

These general and conclusory arguments are insufficient to satisfy Jamie's burden of showing that the trial court erred in concluding there was no fraud. (See *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 [the appellant bears the burden of affirmatively establishing error and demonstrating that it resulted in a miscarriage of justice].) At a minimum, it is unclear from Jamie's arguments what specific misrepresentations or failures to disclose she is referencing.

Even if we assume that Jamie is referencing the arguments she made above regarding Frank's alleged failure to comply with disclosure requirements and his purportedly misleading August 2011 Declaration, those arguments fail on similar grounds: (1) Frank's incomplete preliminary declaration of disclosure did not keep Jamie "in ignorance or . . . prevent[] [her] from fully participating in the proceeding" because it was fully augmented by detailed financial valuations of the Dodger Assets; and (2) Frank's August 2011 Declaration did not misrepresent that a Dodger RSN was without value and, in addition, the record shows Jamie did not rely on her purported understanding of that document.

Jamie also does not challenge the trial court's finding that she failed to show she relied on Frank's alleged misrepresentations or his failure, in January 2010, to list the estimated value of the Dodger Assets. Jamie's lack of reliance constituted an independent ground for the court's finding that Jamie had not shown she had been "kept in ignorance" or "fraudulently prevented from fully participating" in the action. (Fam.

19

Code, § 2122, subd. (a).)  In short, Jamie has not shown that the trial court abused its discretion in concluding that she had failed to show fraud.

    4.    *Mistake*

To set aside a stipulated or uncontested judgment based upon mistake, the mistake may be "either mutual or unilateral, whether mistake of law or mistake of fact." (Fam. Code, § 2122, subd. (e).)  Here, Jamie contends that the evidence showed that when she signed the MSA she mistakenly believed that the Dodger Assets had a net value of $300 million when, in fact, their net value was $1.7 billion.  Jamie calculated the $1.7 billion amount by adding the Dodger Assets' sales price of $2.15 billion to the $150 million Frank retained in "long term rights" and then subtracting the $600 million in debt that was associated with the Dodger Assets.

As explained above, we must defer to the trial court's determination that Jamie's testimony was not credible, and other evidence in the record supports the trial court's finding Jamie knew that the net value of the Dodger Assets was in excess of $300 million when she signed the MSA.  In addition, although Jamie contends she never saw the RSN Valuation Analysis or other documents that discussed a Dodger RSN, that evidence was, as acknowledged by Jamie in her reply brief,  produced by Frank before the MSA was signed.  That Jamie purportedly chose not to review documents produced to her in discovery does not provide grounds for her to later claim mistake based on her ignorance of those documents.  (See *In re Marriage of Burkle, supra,* 139 Cal.App.4th at p. 741 ["a spouse who for[e]goes investigation and accepts a proposed settlement 'may not later avoid the agreement unless there has been a misrepresentation or concealment of material facts.'  [Citation.]"]; see also *Lazzarevich v. Lazzarevich* (1952) 39 Cal.2d 48 ["Ordinarily a person is held to know what his attorney knows and should communicate to him . . . ."])

Furthermore, there was no determined value for the Dodger Assets at the time the MSA was executed and judgment was entered.  As acknowledged by Jamie in her August 2011 income and expense declaration, "[t]he precise market value [of the Dodger Assets] is not known" and depends "in part on what the market reaction would

be to a sale . . . ." In addition, when the parties were negotiating their settlement, the team was subject to a bankruptcy proceeding in which its fate was uncertain, Frank was attempting to sell the media rights separate from the team, Fox was threatening to sue the Dodgers if the media rights were sold prior to the expiration of the Fox-Dodgers' telecast agreement, and the MLB had threatened to force a sale of the Dodgers. Jamie acknowledged this when she represented to the court that the MLB might take control of the Dodgers and that, if the MLB forced a sale, the team would not sell for the "maximum value." Lastly, the value of the Dodger Assets was ultimately established in a public auction supervised by the bankruptcy court.[10]

Quite simply, the trial court was correct in finding that Jamie was not mistaken when she executed the MSA and judgment. Jamie simply chose the security of a guaranteed $131 million payment, plus more than $50 million in real and personal property, over the uncertainty and risk presented by the valuation and sale of the Dodger Assets.

5.      *Family Code Section 2601*

Finally, Jamie contends that "Family Code § 2601 (section 2601) entitled Jamie to a payment equal in value to the value of the assets awarded to Frank" and the trial court was not authorized to "waive Jamie's rights to an equalizing payment under Section 2601 . . . ." Section 2601 provides that "[w]here economic circumstances warrant, the court may award an asset of the community estate to one party on such conditions as the court deems proper to effect a substantially equal division of the community estate."

Jamie does not explain how section 2601 created grounds for the MSA or judgment to be set aside. In fact, Jamie's motion was filed pursuant to Family Code section 2122 which provides six exclusive grounds to set aside a judgment: actual fraud,

---

[10]      We also note that Jamie's entitlement to a share of the Dodger Assets had not yet been determined. The parties had initially agreed to hold a trial on the characterization of these assets as community property or separate property but settled without obtaining a court decision on this question.

perjury, duress, mental incapacity, mistake, or failure to comply with the disclosure requirements. (See *In re Marriage of Rosevear, supra,* 65 Cal.App.4th at p. 684 [Family Code section 2122 specifies "the exclusive grounds and time limits for an action or motion to set aside a marital dissolution judgment"].) That a spouse may qualify for relief under section 2601 is not one of those grounds.[11]

### *DISPOSITION*

The order is affirmed. Frank is to recover his costs on appeal.

### *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

LAVIN, J.[*]

WE CONCUR:

EDMON, P. J.                    KITCHING, J.

---

[11]     Entire paragraphs in this section of Jamie's brief are copied verbatim from Jamie's "trial brief" filed during the proceedings below. In fact, large portions of Jamie's entire opening brief are also simply copied from her trial brief. We note that such an approach ignores the fundamental distinction between the trial court and appellate court: "[w]e do not retry cases on appeal" but rather review the actions taken in the trial court. (*FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1276.)

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.